525 A.2d 1081

**In re ADOPTION NO. 85365027/AD IN the CIRCUIT COURT FOR BALTIMORE CITY.**

**No. 930, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

June 3, 1987.

Joseph V. Rohr, Jr., Baltimore, for appellant.

M. Albert Figinski (Andrea F. Kelly and Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A., on the brief), Baltimore, for appellees.

Argued before BISHOP, BLOOM and POLLITT, JJ.

POLLITT, Judge.

On December 28, 1985, Christine gave birth to a baby boy. Pursuant to arrangements for a private adoption she had initiated several days earlier, and while still recovering in the hospital, Christine, on December 30, signed a consent to the adoption of the newborn infant by appellees. Appellees filed the consent and their petition for adoption with the court on December 31, at which time Judge John Carroll Byrnes entered a decree of adoption.

Undergoing an apparent change of heart, Christine informed her attorney, Kathleen Gallogly, on January 14, 1986, that she was having second thoughts. The next day Gallogly telephoned Frank, the attorney representing the adoptive parents and brother of the adoptive father. Gallogly, according to Frank's version of the call, informed Frank that Christine was "hysterical" and "wanted to know

where the baby was." Gallogly and Frank also engaged in a discussion of the decree of adoption, which Gallogly felt could not be construed as final.

At 8:00 the next morning, January 16, Frank met with Judge Byrnes ex parte and obtained the Judge's signature on a new, final decree of adoption. They discussed only Maryland Code (1984), § 5–324 of the Family Law Article, which prohibits the entry of a final decree of adoption until at least 15 days after the birth of the child. The caption of the earlier decree was changed to "interlocutory." Gallogly formally filed Christine's signed revocation of consent a few hours later.

Christine moved to vacate the order of adoption on January 26. Judge Hilary D. Caplan, after hearing arguments on March 4 and May 27, 1986, denied the motion, and Christine appealed to this Court. We view the essential issue on appeal to be simply whether the trial court abused its discretion by failing to vacate the order of adoption. We have no difficulty in concluding it did. We have greater difficulty, however, in fashioning a remedy for Christine that preserves her rights as the natural mother while simultaneously serving the best interests of the child, who has now been in the appellees' care for 16 months. We turn first to the trial court's consideration of Christine's motion to vacate.

The trial court's revisory power over the entry of the final order of adoption is governed by Rule 2–535(a), as appellant filed her motion to vacate well within the 30 days after judgment specified by the Rule. The Rule provides that, in such circumstances, the trial court "may exercise revisory power and control over the judgment." Our own previous opinions and those of the Court of Appeals have repeatedly and emphatically interpreted this language (and that of its predecessor Rules) as imposing an affirmative obligation upon the trial court to exercise its "extremely broad power of revision liberally lest technicality triumph over justice." *Haskell v. Carey,* 294 Md. 550, 558, 451 A.2d 658, 663 (1982); *J.B. Corp. v. Fowler,* 258 Md. 432, 435, 265

A.2d 876, 878 (1970); *Hamilton v. Hamilton*, 242 Md. 240, 243, 218 A.2d 684, 686, *cert. denied*, 385 U.S. 924, 87 S.Ct. 239, 17 L.Ed.2d 147 (1966); *Eshelman Motors Corp. v. Scheftel*, 231 Md. 300, 301, 189 A.2d 818, 818 (1963); *Weaver v. Realty Growth Investors*, 38 Md.App. 78, 379 A.2d 193 (1977); *Kaplan v. Bach*, 36 Md.App. 152, 373 A.2d 71 (1977); *Chase v. Jamison*, 21 Md.App. 606, 320 A.2d 580 (1974).

Armed with this formidable battery of case law we examine whether the trial court abused its discretion in refusing to vacate the adoption order. In making this determination we are directed to pay particular attention to "whether the trial court entertained a reasonable doubt that justice had not been done." *Cromwell v. Ripley*, 11 Md.App. 173, 177, 273 A.2d 218, 221 (1971), *citing Abrams v. Gay Investment Co.*, 253 Md. 121, 251 A.2d 876 (1969); *Hamilton, supra; Ryan v. Johnson*, 220 Md. 70, 150 A.2d 906 (1959); and *quoting Clarke Baridon, Inc. v. Union Asbestos and Rubber Co.*, 218 Md. 480, 483, 147 A.2d 221, 223 (1958).

In cases of adoption, such as this one, notions of equity, statutory and case law all attempt to safeguard the parental rights of the natural mother and father. In the context of a motion to vacate an unenrolled adoption decree, as opposed to decrees in other types of actions, the trial court is therefore required to exercise a perhaps extraordinary degree of caution to ensure that "technicality" has not "triumphed" over the just rights of the parent.

The Supreme Court has classified the parental rights of the natural mother and father as "far more precious than property rights" and protected by the due process clause of the Fourteenth Amendment. *Stanley v. Illinois*, 405 U.S. 645, 649, 92 S.Ct. 1208, 1211, 31 L.Ed.2d 551 (1972). Prior to *Stanley*, in *Walker v. Gardner*, 221 Md. 280, 284, 157 A.2d 273, 276 (1960), the Court of Appeals articulated the role parental rights played in the social policy of this State by declaring that these considerations "have led the Legislature and this Court to make sure as far as possible that

adoption shall not be granted over parental objection unless that course clearly is justified." *See also Bridges v. Nicely,* 304 Md. 1, 7, 497 A.2d 142, 145 (1985), where the Court wrote "adoption should not be granted over parental objection unless that course is clearly warranted, bearing in mind ... all just claims of the objecting parent."

The Legislature has codified this policy in Subtitle 3 of the Family Law Article, which states as two of its purposes the protection of:

(2) natural parents from a hurried or ill-considered decision to give up a child, ... [and]

(3) adoptive parents: ...

(ii) from a future disturbance of their relationship with the child by a natural parent.

Section 5–303. When this legislation is superimposed on Rule 2–535, the combined effect is obvious. Rule 2–535(a), governing unenrolled decrees, safeguards the interests of the natural parent by allowing the parent 30 days after the entry of a final decree of adoption to show that the decree exalts technicality over justice. The natural parent must create in the trial judge's mind "a reasonable doubt that justice has been served." After the enrollment of the decree, the adoptive parents are protected from disturbances of their relationship with the child, absent a showing of "fraud, mistake, or irregularity." Rule 2–535(b). *See also* § 5–325 of the Family Law Article which provides further protection from any procedural or jurisdictional defect after one year from the entry of the final decree.

■ In the present case, appellant, the natural mother,[1] moved to vacate the final order of adoption ten days after the order was entered, before enrollment of the decree. The proper inquiry for the trial judge, in such cases, concerns the circumstances surrounding the entry of the final decree. He must determine if the rights of the natural

---

1. The purported natural father signed a consent agreeing to the adoption, and waiving any rights he may have had. He did not move to vacate the adoption.

mother have been terminated in a manner consistent with justice. If he has any "reasonable doubt," he should vacate the order.

Testimony at the hearing on the motion to vacate before Judge Caplan revealed that appellant had initially been informed by Gallogly that adoption procedures usually involved a six-month waiting period,[2] during which time she could revoke consent; that although what was eventually titled an interlocutory decree of consent had been entered on December 31, appellant's consent contained no notice that an interlocutory decree would cut off her right to revoke; that Gallogly informed appellant on January 2 that she would have only until "mid-January" to revoke; that appellant telephoned Gallogly on January 14 and in an emotionally-charged conversation questioned the decision to consent; that Gallogly recommended appellant seek counseling to help her make the decision on consent; that Gallogly telephoned attorney Frank on January 15, and in Frank's words,

> She said, "Frank, I've just received a call from Christine and Christine was hysterical. She wanted to know where the baby was".... She [Gallogly] sensed some sort of anxiety in her discussion with Christine ... I guess I would describe it as, sort of, post-partem blues ... At that point, the conversation shifted to the order that was signed in the case. Miss Gallogly said to me, do you have a final order in the case. I said, Judge Byrnes signed an order the day we were down there;

that at 8:00 the next morning Frank met with Judge Byrnes ex parte and obtained the Judge's signature on a new, final order of adoption; and that a few hours later, after she first obtained Christine's signature, Gallogly filed Christine's revocation of consent with the court.

---

**2.** Gallogly inquired at the clerk's office in the Circuit Court for Baltimore County in reaching this conclusion. The procedure here was accelerated when appellees successfully petitioned the Circuit Court for Baltimore City to waive an investigation of the adoptive parents.

Based on this testimony Judge Caplan made the following factual finding:

The Court also believes the adoptive parents were anxious to get the final order signed as any adoptive parents might be, and the argument has been made by Mr. Rohr [counsel for Christine at the hearing] that the next morning, very early morning, which indeed it was, that after conversation with [Frank]—this is [Frank], the attorney—that he ran down to the courthouse and basically beat other counsel down to the courthouse to file the decree of adoption before the revocation was filed.

Judge Caplan nonetheless refused to vacate the order because

the mother in this case was not really aware of what her intentions were. The evidence in my mind was very clear at the time she was on the witness stand that she said, and I wrote in my own notes, and it is very clear what she said, that she was going to go to counseling before her "final decision" which leads this Court to believe that she had not made a final decision, that she was questioning the decision, but that it was not finally made.

From this Judge Caplan concluded that Christine had not, in fact, revoked in a timely manner, and that because the decree was filed after the 15-day statutory waiting period succeeding the birth of the child, the revocation was ineffective.

In examining the equities of the situation, Judge Caplan observed:

Who has gone through with all the proceedings that were necessary to bring this case to Court and file all the necessary papers, bought all the necessary items for the child, given this child nourishing the last five months? The [adoptive parents], and the [adoptive parents] even went so far as to say that they would give the child back if, number one, there would be a good home for the child and, number two, we would be paid our medical expenses

which they felt justified in requesting, and those items were not able to be met by [Christine].

\*   \*   \*   \*   \*   \*

The [adoptive parents], the parties in this case who have done nothing wrong, who have never changed their minds, who have never wavered in this case, who have consistently done what this Court believes to be the most honorable thing, they attempted to adopt a child or were called, as a matter of fact encouraged, to take this child. They made that decision.  I am sure it was a long-hard decision because they have one other youngster aged ten now and went through that process of the last months preparing for the child and for the adoption, took the child from the hospital, gave the child a fine home.  So when it comes to justice and equity, I think that the adoptive parents in this case have equally as much going for them as does the natural mother.

Although Judge Caplan acknowledged that the "fitness of the parties . . . will in no way affect the legal problem of whether or not there is revocation," he nonetheless ruled:

[T]he mother in this case, the natural mother is 20 years old.  She is living with her 19 year old brother over top of a bar, and the Court believes that the adoptive parents in this case can give this child much more, not necessarily monetary, but emotional stability and continuity based on what I saw on the witness stand.

\*   \*   \*   \*   \*   \*

It seems under the facts of this case, that clearly the adoptive parents can offer more opportunity for the child in almost every aspect.  The natural mother is young.  I don't mean to say that she is not emotionally stable, but she certainly has [been] going through a severe change from wanting to have a child adopted to not wanting to have a child adopted, and then wanting to get counsel in order to make the final decision.  That is the sign of immaturity, and it is the natural mother's emotional state that has created a severe problem in this case for this

young lady. The Court will not perpetrate that indecision by placing this child back with the natural mother in the emotional turmoil that they create for this child.

■ We perceive numerous problems with respect to both the inferences Judge Caplan drew from the facts and with the legal analysis he employed. Judge Caplan's finding that Christine's state of mind was "not clear," upon which he based his decision that there was no revocation, is simply irrelevant. The signed revocation speaks for itself. There is no need to look beyond the revocation for extrinsic evidence as to appellant's state of mind. The revocation is unequivocal. It reads:

I, ... Christine, ... do hereby revoke on [sic] the Consent to Adoption that I signed on December 30, 1985.

. . . . .

I have given the matter a great deal of thought and have concluded that I no longer wish to consent to an adoption of my child.

/s/ Christine ...

We are able to find no ambiguity in this revocation. It admits of only one interpretation, that appellant no longer consented to the adoption of her child.

The appellees maintain nonetheless that the revocation was too late. We are sensitive to the need of adoptive parents for an undisturbed relationship with their child. As we have explained, the Family Law Article and Rule 2–535 work together to protect the conflicting interests of both the natural and adoptive parents.

We wish it were unnecessary to comment that social policy in adoption cases, unlike that in commercial cases, is not served by rigid adherence to the doctrine of "First in time, first in right." [3] As Judge Caplan expressly found, this case involved nothing more than a race to the courthouse between the natural mother and the adoptive parents.

---

**3.** *See* Uniform Commercial Code, § 9–312(5)(a). "Conflicting security interests rank according to priority in time of filing or perfection."

The mere fact that the appellees' attorney arrived first does not end the inquiry into the revocation issue.

■ The proper inquiry centers around the circumstances surrounding the filing of the final order of adoption. Judge Caplan should have examined whether Judge Byrnes would have, or should have, entered the order, had he known of the telephone conversation between Gallogly and Frank of the previous afternoon.[4] We think the undisclosed information contained in the previous afternoon's telephone conversation was of such probative force that it should have, and no doubt would have, precluded Judge Byrnes from entering the final order of adoption.

The information would have revealed that the consenting party had communicated serious doubts about her consent to her attorney, and that a strong possibility existed that she would exercise her statutory right to revoke the consent. These doubts had been expressed by the natural mother to her attorney at least three days before Frank's ex parte meeting with Judge Byrnes. The information would also have revealed that the sole reason for Frank's appearance before him at 8:00 that morning was the telephone call from opposing counsel, who alerted Frank to the statutorily-prescribed waiting period but did not indicate any desire for him to meet with the Judge ex parte. Indeed, we feel that the only reasonable inference to be drawn from this information is that Gallogly did *not* want Frank to race to the courthouse to enter the decree. This is in fact what Judge Caplan found.

---

**4.** Frank failed to disclose the existence of this conversation before Judge Byrnes. Even crediting his version of the conversation, as we have here, (Gallogly testified she told him expressly that "[Christine] wanted to revoke consent") the conversation was nonetheless patently material to Judge Byrnes' decision to enter the final order. On Frank's duty to disclose, *see* Rule of Professional Conduct 3.3(d), which reads:

In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse.

■ Even if Judge Caplan had only a "reasonable doubt" that "justice had been served" by the entry of the order without disclosure of the information, he should have vacated the order. Even in cases that did not involve adoptions, we have previously noted that it is an abuse of discretion for the trial court to refuse to set aside a default judgment where "equitable circumstances would justify striking the judgment." *Berkson v. Berryman,* 63 Md.App. 134, 145, 492 A.2d 338, 344, *cert. denied,* 304 Md. 296, 498 A.2d 1183 (1985). In *Dorsey v. Wroten,* 35 Md.App. 359, 362, 370 A.2d 577, 579 (1977), we found that the trial judge abused his discretion by refusing to vacate an unenrolled consent decree in a contract dispute, where the "trial judge and appellees had full knowledge that the appellant was not consenting to the decree." We reasoned that where the court at the time of entry of the decree knew that one party did not consent, it was error for the trial court to refuse to vacate the unenrolled decree.

In adoption cases this State's appellate courts have traditionally scrutinized final orders carefully. *Falck v. Chadwick,* 190 Md. 461, 59 A.2d 187 (1948), involved an adoption controversy nearly identical to the one now before us, with the exception that the decree attacked there had already been enrolled. There, the natural parents signed the consent less than a week after the birth of the child. The adopting parents immediately took custody of the child, and the decree of adoption was entered six weeks later. The natural parents moved to revoke the decree three months after the decree was enrolled. The petition to revoke the decree alleged, among other things, that the natural mother's attorney advised her the adoption was merely provisional and could not become final and binding for at least six months, at the end of which time she could decide whether or not she wanted to give her final consent to the adoption, and thus the adoption would depend entirely upon her subsequent consent. In upholding the trial court's decision to reopen the decree, the Court of Appeals wrote that the trial court should be

given the opportunity, after defendants have answered, to determine whether the consent of the parents relied on in the proceedings was intelligently and voluntarily given. The decree was obtained *ex parte* and was promptly attacked. In the interest of the child and in view of the allegations made, we hold that the chancellor was correct in overruling the demurrer.

190 Md. at 467–68, 59 A.2d at 190. In this case, the trial court should have credited appellant's challenge to the propriety of entering the order. As we noted, that order never should have been entered. The trial court therefore erred in refusing to vacate it.

■ Although Rule D77 does not require a hearing in adoption cases, we have previously cautioned the trial courts on the prudence of requiring one.

> [T]his case illustrates rather clearly the potential hazards in entering final adoption orders without ever laying eyes on the parties.... The opportunity for fraud, mistake or irregularity would be greatly lessened if the court were to require a personal appearance by the parties ... before issuing a final order. Trial courts would thus be prudent to regard Md. Rule D77 ... as requiring an evidentiary hearing of some sort in *every* case.[5]

*Venables v. Ayres*, 54 Md. App. 520, 533, 459 A.2d 601, 608 (1983) (emphasis in original).

The theoretical effect of our ruling is to restore to appellant all her rights as natural mother of the child. Had the trial court examined the case in this light, it could not have considered the fitness of the parties as parents in determining their respective rights. It was therefore error for the trial court to take any cognizance of what it described as "the equities of the case."

---

**5.** In *Weinschel v. Strople*, 56 Md.App. 252, 466 A.2d 1301 (1983), we acknowledged that this was only a suggestion, and that the Court of Appeals has not seen fit to make it a requirement. The suggestion, nevertheless, remains valid.

Appellant would thus have gained custody of her child absent a finding by the court under § 5–312 or § 5–313 of the Family Law Article, governing adoption cases without parental consent. At this late stage in the litigation, however, the child has been in the custody of the adoptive parents for 16 months and findings under these statutes may perhaps be more easily made by the trial court. We therefore remand to the trial court for further proceedings consistent with this opinion.

JUDGMENT REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT HEREWITH; APPELLEES TO PAY COSTS.