675 A.2d 170

**In re ADOPTION/GUARDIANSHIP NO. 3598 IN the CIRCUIT COURT FOR HARFORD COUNTY.**

**No. 672, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

April 5, 1996.

Reconsideration Denied May 28, 1996.

Certiorari Granted July 3, 1996.

**476**

Alfred N. Kramer, Aberdeen, for appellant.

Dawn Oxley Musgrave, Baltimore, for appellees, adoptive parents.

Mark Nelson, Bel Air, on the brief, for appellee, minor child.

Argued before BLOOM, CATHELL and HOLLANDER, JJ.

BLOOM, Judge.

Without the consent of the natural (biological) father of a child referred to in these proceedings as "Baby Girl S" and over his objection, the Circuit Court for Harford County granted to appellees, the adopting parents, a decree of adop-

tion declaring them to be in law the parents of Baby Girl S. Appealing from that decree, the natural father presents this Court with three questions:

1. Did the Circuit Court for Harford County Maryland have jurisdiction to issue a decree of adoption in this case due to the Due Process and Full Faith and Credit Clauses of the United States Constitution, the Uniform Child Custody Jurisdiction Act, the federal Parental Kidnapping Prevention Act and the Interstate Compact for the Placement of Children as it deprived New York State of jurisdiction over this dispute and of the enforcement of a writ of habeas corpus issued by a New York court which ordered that the appellant have custody of the child?

2. In an independent adoption, is it permissible to unlawfully remove a child from another State and hold the child in Maryland until a sufficient time elapses so that the child's welfare dictates adoption?

3. Pursuant to the Annotated Code of Maryland, Family Law Article, Section 5–312 did the trial court err when it determined that it was in the best interests of the child to terminate the Natural Father's rights to the child, 1) when there were three other elements to be given equal weight to the best interests element, 2) when the clear and convincing evidence, based on the totality of the circumstances, weighed in favor of the Natural Father according to the majority of previous Maryland law and the applicable circumstances, and 3) that statutory limitations did not prevent such a determination?

We shall address appellant's first two questions together, because underlying both of them is the initial issue of whether dismissal of the petition for adoption is the appropriate sanction for a violation of the Interstate Compact for the Placement of Children ("ICPC").

## Facts

Appellant lives in a three bedroom townhouse with his mother, in Poughkeepsie, New York. He works at Cosco Price Club as a cashier, earning $21,000 a year, with a potential of earning up to $32,000 a year. At the time of trial, appellant was approximately 24 years old.

Appellant met the natural mother of Baby Girl S. in 1991, at a dance club called "Let's Dance," in Dutchess County, New York. The two became friendly and would frequently meet at dance clubs. On one occasion in the summer of 1991, the couple had sexual intercourse, as a result of which the natural mother became pregnant. The natural mother was 18 years old and a senior in high school when she became pregnant. Baby Girl S. has been referred to as a multicultural baby throughout the trial; the natural mother is Caucasian, and appellant is partly Shinnicock Indian, partly African–American, and partly Hispanic.

After her sexual encounter with appellant, the natural mother moved from her father's house to the other side of Poughkeepsie to live with her mother and stepfather. The natural mother did not tell appellant where she was moving, and appellant was not able to contact her. Appellant did not learn that the natural mother was pregnant until he saw her at a dance club several months later. Appellant claims that she was then five months pregnant; she maintains that she was only three months pregnant at that time.

Appellant did not deny paternity; he offered to assist the natural mother. Appellant testified that he told her, "If you say I am the father, I am the father. I will live up to my responsibilities." The natural mother corroborated this by testifying that appellant offered to support her. Appellant took the natural mother to Vassar Brothers Hospital on three occasions according to his testimony, twice according to hers, for prenatal care. Appellant did not provide any financial assistance but instead helped the natural mother obtain medical assistance through social services. The natural mother testified that appellant never revealed his last name to her,

telling her that there was no need for her to know his last name. After a doctor's visit, appellant took the natural mother back to his house to meet his family, which supports his testimony that she could easily have learned his last name. Appellant's mother testified that she invited the natural mother to move in with the family.

The couple had minimal contact during the last couple of months before Baby Girl S. was born. The natural mother testified that she no longer wanted to speak to appellant; he testified that he tried calling her and going over to her house but to no avail because her stepfather or mother would always turn him away. On one occasion, appellant went to the natural mother's home and the stepfather approached him and told him to leave, stating that the natural mother did not want to see him anymore.

Meanwhile, the natural mother began meeting with a social worker, Jane Eisenburg, for advice on what to do with the child after birth. The social worker suggested that she consider putting the child up for adoption. Ms. Eisenburg learned about appellees' interest in adopting a child through a mutual friend. Appellees, Caucasians, have been married since October 1986 and are unable to have children of their own. They are licensed foster care parents. The adoptive mother, who was 39 years of age at the time of trial, is a college-educated computer programming analyst, earning $43,-000 a year. The adoptive father, 42 years of age at the time of trial, is a college-educated computer network administrator, earning approximately $50,000 a year. After several telephone conversations and a personal meeting, appellees and the natural mother agreed on the adoption. The natural mother told appellees that the biological father was "out of the picture."

On 27 April 1992, in an effort to expedite adoption of her soon to be born child, the natural mother averred on the application that she submitted to the New York State Administrator of the Interstate Compact for the Placement of Children that the father of the child was "unknown." Prior to

trial, it was stipulated by all parties that the natural mother knew at all times the identity and whereabouts of the natural father, appellant.

On 3 May 1992, the natural mother gave birth to Baby Girl S. Two days later, appellant, having been informed by one of the natural mother's friends about the birth, arrived at the hospital with balloons, flowers, and gifts. As soon as he reached the natural mother's floor, the natural mother's mother and the adoptive mother's father sent for hospital security personnel, who escorted appellant out the back door of the hospital. Appellant testified that the natural mother's mother said, "No [you can't see the baby], you are not supposed to be here," and the adoptive mother's father said, "You have to get out of here." Appellant was never able to see his own daughter.

On the same day, the adoptive mother was visiting the natural mother's mother when she learned about the natural father's attempt to see his child. She testified, "We were sitting, having a cup of tea, talking, and [the natural mother's mother] got a phone call from [her daughter]. She said that appellant and his family barged in on her and were harassing her." The adoptive mother went to the hospital and witnessed security guards escorting appellant out of the hospital. She said at trial, "I didn't want to get into the middle of it. It looked pretty hot." After appellant was removed from the hospital, the natural mother's attorney, Jack Zand, delivered Baby Girl S. to the adoptive mother. The adoptive mother then took the child to her father's house in New Paltz, New York, to await the Compact Administrator's approval to remove the child to Maryland.

Later that same day, the natural mother, represented by independent counsel, Jack Zand, filed an Affidavit Relating to Biological–Father's Consent and an Extrajudicial Consent Form 2–G with the Surrogates Court of the State of New York, County of Ulster, in order to get approval to place the child with adoptive parents out of state. The natural mother,

over her attorney's signature and notary seal, averred, falsely, in the affidavit:

2. The biological father of the child is **unknown** to deponent and no person has taken steps to establish legal responsibility for the child.

(Emphasis added.) The natural mother also falsely stated on Form 2–G, over her attorney's signature and notary seal, that the name and address of appellant were unknown to her. The natural mother never notified appellant about the proceeding before the Surrogate Court.

Two days later, on 7 May 1992, appellant petitioned the Family Court of the State of New York, County of Dutchess, for a Filiation Order declaring him to be the father of Baby Girl S. On 15 May 1992, the natural mother admitted that appellant was the child's father. Her attorney wrote a letter to Judge Adina C. Gilbert of the Dutchess County Family Court, declaring:

I represent [natural mother] of Gardiner, New York, who received a copy of a Summons and Petition of the above-captioned petitioner to be declared the father of a child born out of wedlock to my client on May 3, 1992. The matter is returnable before you for an initial appearance on June 15, 1992.

My client does not deny the allegations of the Petition (although she was unaware of the true name of petitioner) and would consent to the entry of a decree of paternity at this time. There are two reasons for this request.

My client entered into an agreement, before the birth of the child, to place the child for adoption with an out-of-state couple. As of this writing, the requirements for the Interstate Compact approval are near completion and we expect the child to be released to the adoptive parents. We have simultaneously scheduled an appearance by the birth mother at the Ulster County Surrogate's Court to formalize her surrender. In light of the recent Court of Appels [sic] in *Matter of Raquel Marie X.* (76 N.Y.2d 387 [559 N.Y.S.2d 855, 559 N.E.2d 418 (1990)]), it appears likely that the

putative father would be entitled to notice of the Surrogate's Court proceeding and an order in the Dutchess County Family Court at this time acknowledging paternity would enable us to proceed in the Ulster County Surrogate's Court without further delay, now that my client is aware of the name and address of the putative father.

We note that, despite Mr. Zand's admission that appellant was entitled to notice of the Ulster County Surrogate Court proceedings, appellant never received notice of those proceedings. Moreover, there is no indication in the record that the previous affidavits or Extrajudicial Consent Form 2–G were ever amended to acknowledge the natural mother's admissions that appellant was the father of Baby Girl S. Furthermore, apparently in order to delay the issuance of a filiation order, the natural mother later disputed appellant's paternity.

Appellant was not declared to be the natural father of Baby Girl S. until 7 June 1993. One reason for the delay was that appellees stated that they could not have blood drawn from the baby in the first six months, and after that point appellees canceled two subsequent blood tests. Appellant asserts that appellees purposely delayed the paternity determination in order to extend the time the baby had to develop emotional ties with them.

Between 16 May 1992 and 18 May 1992, about two weeks after the birth of the child, according to the testimony of the adoptive father, appellees removed Baby Girl S. from New York and brought her to Maryland. Appellees testified that their attorney, Dawn Musgrave, told them that she got verbal approval from the Interstate Compact Administrator. In fact, neither New York nor Maryland ever approved the application. A handwritten letter dated 27 May 1992 from Sharon Hackett, Maryland's Interstate Compact Administrator to New York's Interstate Compact Administrator, with copy to appellees' attorney, confirms that no approval was ever granted:

Somehow a mixup occurred and this couple came to Md. with the baby prior to approval. Referral is incomplete. I

received only 100 A's from your office. Please send special medical history of birth parents, home study of adoptive parents, delivery and discharge hospital information, and statement from the NY attorney as to how the birth father's rights will be addressed.

To date, neither the Maryland nor the New York Interstate Compact Administrator has approved the removal of Baby Girl S. from New York.

On 22 May 1992, appellees filed a petition in the Circuit Court for Harford County for Adoption and Change of Name of Baby Girl S. Despite the fact that appellees had already brought Baby Girl S. to Maryland from New York, their complaint alleged:

13. Plaintiffs have complied with the requirements of the interstate compact for the placement of children [and] are awaiting final approval from the Maryland Interstate Compact Administrator before bringing the child to Maryland for purposes of finalizing this adoption.

The complaint recognized the existence of appellant and admitted that he had not consented to the adoption.

10. The consent of [appellant] to the adoption of his child by the Plaintiffs has not yet been obtained. Filed herewith is a Show Cause Order and Notice of Objection to be served upon him in the event his consent cannot be obtained....

On 18 June 1992, the Circuit Court for Harford County granted appellees temporary custody of Baby Girl S. A Show Cause Order was issued by the circuit court, notifying appellant that he had the right to object to the adoption. Service of the show cause order was first attempted in early July by restricted certified mail. The show cause order was returned and marked "Unclaimed." In August 1992, service by private process server was attempted. The process server, unable to serve appellant, swore in his affidavit, "Numerous attempts were made at the home address. Never able to find him home. According to neighbors, he works very late in evening and leaves early morning. Tried setting up appointment but he never returned call." A third show cause order was issued

in November 1992, and service was also unsuccessful. Finally, in April 1993, the natural mother's attorney was able to serve appellant at a paternity hearing in New York.

Appellant asserted that immediately following Baby Girl S.'s birth he made numerous attempts to contact the natural mother; he tried calling, but her parents would not let him speak to her; he tried going over to her house, but "[t]hey would see [him] coming and turn out the lights and act like they were not around." Appellant testified that her parents threatened to call the police and claim harassment. Appellant maintains that he did not learn about the adoption until August 1992 when the natural mother told him, at a paternity hearing, that she no longer had the baby.

In November 1992, appellees contacted appellant to set up a meeting. Appellees, appellant, appellant's mother, and appellant's aunt met in a diner in New Paltz, New York, at the end of November 1992. Appellees introduced themselves and showed appellant pictures of Baby Girl S. Both parties described the meeting as amicable and avowed that no harsh words were spoken. The meeting did not resolve the conflict, however; both sides maintained at the meeting their desires to have Baby Girl S.

On 7 June 1993, appellant was declared to be the father of Baby Girl S., the DNA blood tests having indicated that the probability of paternity was 98.19%. On 11 June 1993, appellant filed a notice of objection to the adoption in the Circuit Court for Harford County, Maryland. On 14 December 1993, he filed a motion to dismiss the adoption petition, based on violations of the ICPC. The Circuit Court for Harford County denied the motion.

Trial of the adoption case in the Circuit Court for Harford County began on 7 March 1994. On 14 March 1994, after two days of testimony in the adoption proceedings, the Honorable James D. Pagones of the Family Court of the State of New York, Dutchess County, ruled that the New York court had exclusive jurisdiction over all matters concerning custody, visitation, and adoption of Baby Girl S. and granted appellant

temporary physical custody over Baby Girl S. Judge Pagones, pursuant to the Parental Kidnapping Act, issued a Writ of Habeas Corpus, ordering appellees to transfer custody of Baby Girl S. over to appellant. On 17 March 1994, Judge Pagones and Judge Cypert O. Whitfill, who was presiding over the adoption case, conferred by telephone. They agreed that the Maryland court should continue to exercise jurisdiction and complete the trial of the adoption proceedings and that the New York proceeding would be stayed.

On 14 November 1994, Judge Whitfill issued a memorandum opinion granting appellees' petition for adoption. Appellant subsequently filed a motion to reopen the case, based on new evidence, but the court denied the motion and issued a final decree of adoption in March 1995. This appeal is from that decree.

I

In her dissenting opinion, Judge Hollander rightly characterizes this case as "a painful case." By any criteria suitable for classifying such matters, it certainly qualifies as "a hard case"; and as Baron Wolfe pointed out, in *Winterbottom v. Wright,* 10 M. & W. 116 (1842), "Hard cases, it has been frequently observed, are apt to introduce bad law."

Appellant is a young man who wants to be a father to the child he sired. Appellees are a couple who want to keep the child they have raised as their own since her birth. Our decision will not only have a profound effect on the litigants, it may even have a substantial impact on the future viability of the interstate compact that all fifty states have adopted for the protection and benefit of children. But at the heart of the dispute is a little four-year-old girl who has never known any parents other than appellees. There is a natural inclination to let our concern for what we perceive to be the best interests and future happiness of that child overshadow all other concerns and issues in the case. That natural inclination is what makes this a hard case; we should not let it cause us to introduce bad law.

## II

Appellant contends that in an independent adoption it is impermissible to remove a child unlawfully in violation of the ICPC from another state and hold the child in Maryland until a sufficient time elapses so that the child's welfare dictates adoption. It is beyond dispute that Baby Girl S. was removed from New York by appellees in violation of the ICPC. The child was taken out of New York by appellees without the necessary permission of the Maryland and New York State Compact Administrators. What is not as clear, however, is what sanction the Circuit Court for Harford County may properly impose for such violation. It is appellant's contention that dismissal of the adoption proceeding is appropriate.

■ "An interstate compact is basically an agreement, between two or more states, entered into for the purpose of dealing with a problem that transcends state lines." *In re Adoption No. 10087,* 324 Md. 394, 403, 597 A.2d 456 (1991) (quoting P. Hardy, *Interstate Compacts: The Ties that Bind* 2 (1982)). A compact serves as the law of each state that enacted it and an agreement between those states belonging to the compact. *Id.*

■ The ICPC was created to facilitate interstate adoption and thereby increase the "pool of acceptable homes for children in need of placement." Bernadette W. Hartfield, *The Role of the Interstate Compact on the Placement of Children in Interstate Adoption,* 68 Neb.L.Rev. 292, 293 (1989). The ICPC was enacted to "extend the jurisdictional reach of a party state into the borders of another party state for the purpose of investigating a proposed placement and supervising a placement once it has been made." *Id.* at 296. The problems that existed before the enactment of the ICPC were described by the Council of State Governments in its recommendation to state legislatures:

"At the present time, laws relating to interstate placement are inadequate or nonexistent. A number of states have interstate placement statutes, but they have been enacted unilaterally. Consequently, supervision of the out-of-state

source from which a child may be sent into the jurisdiction is difficult or impossible. When the state having a placement law is the originating point for the child, no legally binding control may be exercised once the placement has been made, unless a really bad situation develops in the other state, is discovered by its welfare authorities, and is treated as a new case needing corrective action on a wholly local basis. Some states, either with or without placement laws have informal arrangements for courtesy supervision of homes in which interstate placements are made. However, the state of origin loses jurisdiction over the child once it has left the state and, if the voluntary arrangements break down or are resisted, undesirable situations can develop."

*Hartfield* at 296 (quoting *Council of State Governments, Suggested State Legislation Program for 1961,* 49 (1960)). The ICPC was originally drafted by the New York State Legislative Committee on Interstate Cooperation and was approved by a twelve state conference in 1960. *Hartfield* at 295. All fifty states have now adopted the ICPC. *In re Baby Girl __,* 850 S.W.2d 64, 68 (Mo.1993).

Maryland has codified the ICPC as §§ 5–601 through 5–611 of the Family Law Article of the Maryland Code (F.L.). F.L. § 5–602 articulates the purpose and policy of the ICPC:

It is the purpose and policy of the party states to cooperate with each other in the interstate placement of children to the end that:

(1) Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.

(2) The appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child.

(3) The proper authorities of the state from which the placement is made may obtain the most complete information on the basis of which to evaluate a projected placement before it is made.

(4) Appropriate jurisdictional arrangements for the care of children will be promoted.

The procedures that must be followed by both the receiving state and sending state are listed in F.L. § 5–604. Section 5–604(a) provides:

No sending agency shall send, bring, or cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this section and with the applicable laws of the receiving state governing the placement of children therein.

Section 5–604(b) requires the sending agency to furnish the proper authorities in the receiving state written notice of the intention to send the child into the receiving state. The notice shall include, *inter alia*, the name, date, and place of birth of the child, the identity and addresses of the parents or legal guardian, and a statement of the reasons for such proposed action. The receiving state may request additional information in order for it to carry out the purpose and policy of the compact. Most important, § 5–604(d) provides that no child shall be sent into the receiving state until the appropriate public authorities in the receiving state notify the sending agency in writing that the proposed placement is in the best interests of the child. Under the ICPC, there is an initial investigation made in the sending state, and there is a subsequent investigation made in the receiving state.

Section 5–606(a) provides that the sending agency shall retain jurisdiction over the child. It provides:

The sending agency shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment and disposition of the child which it would have had if the child had remained in the

sending agency's state, until the child is adopted, reaches majority, becomes self-supporting or is discharged with the concurrence of the appropriate authority in the receiving state. Such jurisdiction shall also include the power to effect or cause the return of the child or its transfer to another location and custody pursuant to law. . . .

■ The inclusion of the term "person" in the definition of "sending agency" in § 5–603 means that both the natural parents and adoptive parents can be considered sending agencies. *In re Adoption No. 10087*, 324 Md. at 404–05, 597 A.2d 456. A "person" who "sends, brings, or causes to be sent or brought any child to another party state" is a sending agency. In this case, the natural mother is a sending agency because she sent or caused Baby Girl S. to be sent into Maryland. Appellees also constitute a sending agency because they brought or caused Baby Girl S. to be brought into Maryland. *See In re Adoption of Male Infant A.*, 150 Misc.2d 893, 578 N.Y.S.2d 988, 993 (Fam.Ct.1991) ("the recipient of a child is also a sending agency if it causes a child to be sent or brought across state lines"); *In re Adoption of T.M.M.*, 186 Mont. 460, 608 P.2d 130, 132 (1980); *Hartfield* at 309 ("[T]he definition of a sending agency is so broad that a party having custody of a child for purposes of adoption who moves with the child from one party state to another party state, before the adoption is finalized, may be a sending agency.").

Each state that is a party to the ICPC must have a compact administrator responsible for coordinating ICPC activities. Compact administrators of member states are authorized by Article VII of the ICPC to issue rules and regulations jointly. *Hartfield* at 301. In Maryland, the compact administrator is part of the Department of Human Resources, Social Services Administration. F.L. § 5–601.

■ In this case, there were numerous violations of the ICPC. First, the natural mother, a week before Baby Girl S.'s birth, falsely stated in her application for ICPC approval that the natural father was "unknown." Second, the natural mother falsely swore in an affidavit and in an Extrajudicial

Consent Form to the Surrogate Court, Ulster County, New York, that the natural father was "unknown." Worse yet, the natural mother failed to amend her false statements even after she admitted that appellant was the natural father. Moreover, appellant was never served with notice of the proceedings in the Surrogate Court, even though the natural mother's attorney acknowledged in his letter to the presiding judge in the filiation case in the Dutchess County Family Court that the natural father was entitled to service. The failure on the part of that attorney (who was hired by appellees to represent the natural mother) to notify appellant of the Surrogate Court proceedings, was reprehensible. Because appellant was not notified of those proceedings and thus did not appear before it, the Surrogate Court gave the natural mother the certification required by New York law to proceed with the adoption. If appellant had been identified as the father of the child and his objections revealed, the New York State Compact Administrator and the New York Surrogate Court in Ulster County would certainly not have permitted appellees to remove Baby Girl S. from New York.

Appellees' violation of the ICPC further compounded the problem. Their premature removal of Baby Girl S. from New York, without ICPC approval, effectively circumvented the Maryland Compact Administrator's determination. Although appellees aver that their attorney told them that she had received oral approval, the adoptive mother admitted that she had not received any notice from either the New York or the Maryland Compact Administrator that removal of the child from New York had been approved. Whether the violation was solely the fault of the attorney in misleading appellees, or whether appellees are also to blame, the result is the same: in bringing the baby to Maryland, appellees violated the ICPC, which is the law of Maryland. Furthermore, since the adoptive father's testimony established that the child was brought to Maryland on or before 18 May 1992, appellees falsely alleged in their petition for adoption, filed on 22 May 1992, that they had complied with the requirements of the ICPC and were awaiting final approval from the Maryland Inter-

state Compact Administrator before bringing the child to Maryland.

On 27 May 1992, the Maryland Interstate Compact Administrator sent to appellees' attorney a carbon copy of a letter to the New York Compact Administrator that clearly demonstrated that ICPC approval had not been granted. If appellees or their attorney had theretofore been acting under a mistaken belief that removal of the child to Maryland had been approved by the Maryland Compact Administrator, that letter of 27 May 1992 would certainly have notified them that they were in error. Nevertheless, appellees never amended their adoption petition to correct their misrepresentation to the court that they had complied with Compact requirements and that the child would remain in New York until the Maryland Compact Administrator approved removal of the child to Maryland. In all probability, if the circuit court had been promptly notified, in May 1992, that the child was in Maryland and that the Compact Administrator had not approved the removal of the child from New York this case would not have proceeded as it did. An investigation would have revealed appellant's opposition and thus might well have prevented the unfortunate situation now confronting us.

We also find it troubling that appellees were aware of appellant's objection before they received the child but did nothing to ensure that the appropriate authorities were informed of his identity, much less his objection, before they removed Baby Girl S. from New York. Appellees testified that they were aware that the natural father went to the hospital to see the natural mother and Baby Girl S. The adoptive father referred to appellant's appearance at the hospital as an "objection" to the adoption. When asked by appellant's counsel for a clarification of what he meant by "objection," the adoptive father stated that appellant was objecting "to [the] natural mother giving the baby up for adoption." Appellees testified that they made no effort to contact the natural father while in New York to get his approval. Appellant's objection should have made appellees more sensitive to the need for the child to remain in New York

until proper affirmation was made by the ICPC. If the New York Compact Administrator or the Surrogate Court had known that appellant was asserting his rights as natural father, it is very unlikely that the ICPC would have approved the adoption. Once adoptive parents remove a child from a state without ICPC approval, however, the ICPC is made powerless to determine the "best interests of the child." The adoptive parents thus circumvented the ICPC's determination.

Moreover, appellees, as the "sending agency," did not strictly comply with the written notice requirement. F.L. § 5–604 requires the sending agency to notify the appropriate authorities in the receiving state of the natural parents' identities and addresses. Although it was the natural mother who initially committed the fraud upon the New York State Compact Administration and the Surrogate Court, appellees had a duty under F.L. § 5–604 to notify the Maryland Compact Administrator immediately of appellant's identity and address. The adoptive parents acknowledged that they knew who the natural father was but still failed to comply. The adoptive parents are not without blame for the natural mother's fraud under the requirements of the ICPC, especially since they hired and paid the natural mother's attorney.

In view of this violation of the ICPC, the principal question before us is what action should the circuit court have taken to rectify the problem? F.L. § 5–605 does not provide clear guidance to the courts. It states:

> The sending, bringing, or causing to be sent or brought into any receiving state of a child in violation of the terms of this compact shall constitute a violation of the laws respecting the placement of children of both the state in which the sending agency is located or from which it sends or brings the child and of the receiving state. Such violation may be punished or subjected to penalty in either jurisdiction in accordance with its laws. In addition to liability for any such punishment or penalty, any such violation shall constitute full and sufficient grounds for the suspension or revocation of any license, permit, or other legal authorization held

by the sending agency which empowers or allows it to place, or care for children.

Although it specifies that a violation of the compact violates the laws of both the sending and receiving state and can be punished in accordance with its laws, and that a sending agency can lose its license, permit, or legal authorization to place or care for children, § 5–605 does not clearly state what, if any, sanction can or should be applied by the trial court in the pending adoption proceeding.

The Supreme Court of Montana, in *In re Adoption of T.M.M.*, 186 Mont. 460, 608 P.2d 130 (1980), held that dismissal of the adoption petition was appropriate under the ICPC's penalty provision because a violation removes the natural mother's "legal authorization" as a sending agency to send the child out of state. In *In re Adoption of T.M.M.*, a natural mother executed a "parent's consent" in Mississippi, permitting her five-year-old child to be adopted by a couple in Montana. The adoptive parents traveled to Mississippi to pick up the child, and after a brief stay, returned to Montana with the child. Three months later the adoptive parents filed a petition for adoption in Montana. In an *ex parte* hearing, with the natural mother receiving no notice of the hearing, the Montana court terminated the natural mother's parental rights. One month later, the natural mother filed a withdrawal of consent document in Montana, and the court dismissed her action to recover the child, based on its previous termination of the natural mother's parental rights. The natural mother argued on appeal that the adoptive parents removed the child from Mississippi without complying with the ICPC. The adoptive parents argued that the ICPC does not apply because no sending agency was involved in placement of the child. The Supreme Court of Montana disagreed with the adoptive parents, ruling that the inclusion of "person" in the definition of sending agency means that natural parents and adoptive parents can be the sending agency. The Supreme Court of Montana held that the adoptive parents violated the ICPC by failing to furnish the Department of Social Rehabilitation Services with written notice of their intention to bring

the child from Mississippi to Montana. *Id.* at 132. In ordering that the adoptive parents' petition for adoption be dismissed, the Supreme Court of Montana ruled:

> By virtue of the failure of the prospective adoptive parents to comply with the Compact, the placement of the child with the prospective adoptive parents in Montana constituted an illegal placement under the provisions of the Compact....
>
> . . . . .
>
> The "parent's consent", executed by the natural mother, is the "legal authorization" held by the prospective adoptive parents. Thus the failure of the prospective adoptive parents to comply with the terms and procedures of the Compact constitutes full and sufficient grounds for the revocation of the "parent's consent."

*Id.* at 134.

In *In re Adoption No. 10087*, 324 Md. 394, 597 A.2d 456 (1991), the Court of Appeals of Maryland had occasion to address this issue and to comment on *In re Adoption of T.M.M.* In *In re Adoption No. 10087*, the adoptive parents, residents of Maryland, placed an advertisement in a Potomac newspaper under a false surname, seeking to adopt a baby. The natural mother, a resident of Virginia, responded to the advertisement and subsequently executed consents and affidavits for the adoption. The documents did not contain the adoptive parents' names or address. The adoptive parents attempted to invoke the ICPC by notifying the compact offices in both Maryland and Virginia. The Virginia compact office notified the adoptive parents that the ICPC–100A form, which initiates the approval process, must include the names and address of the adoptive parents. The adoptive parents refused to comply with this provision, and the Virginia compact officer refused to facilitate the adoption. Despite this disapproval, the adoptive parents removed the baby across state lines to Maryland in violation of Maryland law and the ICPC. The adoptive parents filed their adoption petition in the Circuit Court for Montgomery County, and the circuit court dismissed the action because of the violation of the ICPC.

This Court subsequently affirmed the dismissal in an unreported opinion.

The Court of Appeals ruled that dismissal was inappropriate under the facts of the case. The Court first opined that although those who obtain custody of children unlawfully must be deterred, some circumstances require the protection of the best interests of the child and, therefore, that the "unlawful acts be blinked." *Id.* at 410, 597 A.2d 456 (quoting *Bennett v. Jeffreys,* 40 N.Y.2d 543, 387 N.Y.S.2d 821, 827, 356 N.E.2d 277, 283 (1976)). The Court further noted, "The 'golden rule' of adoption in Maryland is, and has always been, the best interest of the child." *Id.* at 411, 597 A.2d 456 (quoting *In re Lynn M.,* 312 Md. 461, 540 A.2d 799 (1988)).

The Court next held that Maryland courts have jurisdiction to adjudicate the matter despite the violation of the ICPC. The Court reasoned:

> Petitioners' failure to comply with the ICPC does not deprive Maryland of jurisdiction over the adoption. The ICPC contemplates adoption in the receiving state. While compliance with the compact is designed to assure the child's welfare pending that adoption, the circuit court has "exclusive power to sever the legal ties between parent and child by allowing the adoption of the child by another." Approval of the compact office is necessary to assure, at the outset, that a placement is not contrary to the child's welfare; but it is not a substitute for a judicial determination of the child's best interest, nor is it a prerequisite to jurisdiction. The child who is the subject of this proceeding has now been present in Maryland for approximately two years, and the adoptive parents are domiciled in Montgomery County. Circuit courts have jurisdiction over adoptions in Maryland.... "[V]enue for a proceeding for adoption of a person who is *physically within* the State" (emphasis added) is in a county where the petitioner is domiciled or has resided for at least 90 days next preceding the filing of the adoption petition. Therefore, the Circuit Court for

Montgomery County was an appropriate forum to consider this adoption petition.

*Id.* (citations omitted).

The Court further held that the violation of the ICPC in the case did not mandate dismissal. The court concluded:

> In the face of ICPC violation, a circuit court is not limited to granting the adoption without ICPC approval or denying the petition for adoption. It may consider other alternatives, including requiring retroactive ICPC compliance. Obviously, to simply grant an adoption without compact approval undermines the effectiveness of the ICPC. We therefore reject this option absent extraordinary circumstances.

*Id.* at 412, 597 A.2d 456 (citations omitted).

The Court then examined the holding of the Supreme Court of Montana in *In re Adoption of T.M.M., supra.* Noting that the Montana Court never addressed the best interests of the child but instead dismissed the case on procedural grounds, the Court cautioned that "[s]uch summary dismissal of an adoption petition on a procedural basis without consideration of the child's welfare is not appropriate where the only parties before the court seeking custody of the child are the prospective adoptive parents." *Id.* As a result, the Court ruled that dismissal was not the appropriate remedy in the case before it. The Court concluded that the best way to approach violations of the ICPC is "to require, whenever practicable, retroactive compliance with the compact." *Id.* at 413. The Court suggested that, to protect the child, retroactive compliance be made at "the earliest opportunity." *Id.* The Court did acknowledge the fallibility of such a requirement. "Both retroactive compliance and finalization of adoptions despite ICPC violations encourage subsequent violations." *Id.* at 413–14 (quoting *Hartfield* at 319).

The factual situation in *In re Adoption No. 10087* is distinguishable from this case. The Court of Appeals made clear that summary dismissal was inappropriate in the case before it because there were no natural parents to whom the circuit

court could return the child. "In such a case, summary dismissal would require that the child be left in limbo or placed in the custody of either the Maryland or Virginia child welfare agencies.... [I]t may be adverse to the child's best interest to remove it to a social services agency solely because the adoptive parents violated the ICPC." *Id.* at 412, 597 A.2d 456. Furthermore, the Court explicitly stated that it was neither accepting nor rejecting the holding in *In re Adoption of T.M.M. Id.* at 410, 597 A.2d 456. The Court expressly noted that the case before it was unique in that there were no natural parents involved in the case. Most important to our determination, the Court warned that it will not tolerate adoptive parents removing a child from another state into Maryland in an effort to have the best interest of the child standard dictate adoption.

> We stress that it should not be concluded from this decision that it is permissible to illegally remove a child from another state and hold it in Maryland until a sufficient time elapses so that the child's welfare dictates adoption. The particulars of this case are unique in that neither the natural parents nor the state of Virginia have, so far, sought to exercise their claims over the child.

*Id.* at 414, 597 A.2d 456.

We are now faced with a more troublesome situation than that confronting the Court of Appeals in *In re Adoption No. 10087:* we must now decide what actions a circuit court must take when adoptive parents remove a child from another state in violation of the ICPC and hold the child in Maryland for a sufficient time that the best interests of the child would seem to dictate adoption, but there is a natural parent contesting the adoption.

We first note that retroactive compliance, as a possibility suggested by the Court of Appeals in *In re Adoption No. 10087,* would not be practicable in the case at hand. The Court of Appeals stated that it should be done at the earliest opportunity to protect the best interests of the child. In the case *sub judice,* however, nearly four years have passed since

the violation of the ICPC. Retroactive compliance would be inequitable in this situation. If the New York State Compact Administrators had had to decide this case four years ago, when it should have been decided, and discovered that appellant wanted to keep Baby Girl S., it is highly unlikely that they would have approved the adoption. A present evaluation of the situation would be greatly biased, because Baby Girl S. has already developed strong ties with the adoptive parents. The New York State Compact Administrators might feel compelled to approve the placement retroactively in order to protect the best interests of Baby Girl S. In essence, requesting retroactive compliance in this situation would be asking the Compact Administrators to rubber stamp and ultimately reward an illegal act. Therefore, we are not persuaded that retroactive compliance would have been the proper course for the trial court to take.

We also note that the Secretariat of the Association of Administrators of the ICPC [1] issued an advisory opinion in 1993 specifically rejecting the "retroactive compliance" approach suggested by the Court of Appeals in *In re Adoption No. 10087*. American Public Welfare Association, *The Interstate Compact on the Placement of Children: Compact Administrators' Manual*, 3.152 (Secretariat Opinion 60, January 26, 1993). In rejecting the approach recommended by the Court of Appeals, the Secretariat stated:

> The majority took the position that the "best interests" of the child in this particular case was the paramount consider-

---

1. The Secretariat is provided by the American Public Welfare Association to the Association of Administrators. The role of the Secretariat is described by Professor Hartfield:

   The Secretariat performs certain coordinating functions on a national level, including record keeping, the compilation and dissemination of data, the maintenance of the Compact Administrators' Manual, technical assistance, and other duties as contracted with by the Association of Administrators. One of the other functions of the Secretariat is to furnish advisory opinions to compact administrators. Those opinions are then included in the Compact Administrators' Manual. Although Secretariat Opinions do not have the force of law, they are often cited by courts as persuasive authority in ICPC matters.

   Hartfield at 301.

ation. It had no jurisdiction to give effect to Virginia law. Apropos of the best interests of the child, the Court observed that no other prospective adoptive parents were offering to take the infant. The clear inference was that the child would be better off with the present petitioners for adoption. Under this majority reasoning, prospective adoptive parents and their attorney can violate ICPC and the child protective laws of the state where they acquire the child with every confidence that they will succeed.

*Secretariat Opinion* at ·3.155. The Secretariat was concerned that a post-placement evaluation would be heavily biased in favor of the adoptive parents.

As already noted, when a child is already in placement, bonding has occurred or is well underway. If the inquiry is limited to the interests of this particular child, the situation has already been heavily prejudiced. Under a proper ICPC procedure, investigation and evaluation occurs [sic] before the child enters the preadoptive home. At that stage, it is open to evaluate the proposed placement against proper standards of adequacy. There is no acquaintance or family-like relationship between the child and placement recipient(s). But once the child is in the home, there is tremendous pressure to accept even a marginal situation as the best or only one available.

*Id.* at 3.156.

We believe that, in a situation in which a natural parent objects to the adoption and the adoptive parents violate the ICPC, the enforcement approach taken by the Supreme Court of Montana in *In re Adoption of T.M.M.* is instructive and persuasive. A violation of the ICPC by adoptive parents can lead to a revocation of their legal authorization to bring the child into the state.

The Supreme Court of Missouri, in *In re Baby Girl* ——, 850 S.W.2d 64 (Mo.1993) (*en banc* ), acknowledged the validity of Montana's interpretation of the enforcement provisions in the ICPC. In *In re Baby Girl* ——, a natural mother of a child sought to withdraw her consent to adoption after the child was

removed from the state in violation of the ICPC. The Supreme Court of Missouri, in remanding the case to the trial court, ruled that violations of the ICPC can result in revocation of the natural mother's consent. The Court stated:

We believe ... that [the approach taken by the Supreme Court of Montana] may be a proper remedy or sanction in appropriate circumstances. While the state has a profound interest in providing a mechanism for the adoption of children whose parents are unable or unwilling to care for them by persons who desire that responsibility, it has an equally significant interest in regulating adoptions in order to protect the interests of the child and to prevent the black market trade of children. The Compact ... helps protect those interests. If all the parties involved with an adoption are aware that their actions may cause the revocation of a natural parent's consent, then they will be discouraged from circumventing the law.

*Id.* at 71.

The Missouri Court concluded, however, that dismissal was not automatic but instead was in the discretion of the trial court. The Court continued:

While we agree with the Supreme Court of Montana, that revocation of a consent may be justified, the statute does not establish a per se rule. Instead, the statute provides that "any such violation shall constitute full and sufficient grounds for the suspension or revocation of any license, or permit, or other legal authorization held by the sending agency which empowers or allows it to place, or care for children." We believe this language allows the trial court discretion to enter an order as to the continuing validity of a consent and the custody of the child that it finds just in light of the facts and circumstances of the case before it. Again, at the pinnacle of the court's decision must be the child's best interests, not the interests of the other parties or even "public policy." These matters must be determined on a case-by-case basis. Revocation of consent based merely on

Compact noncompliance could produce a potentially harsh result that may be contrary to the child's best interests. *Id.*

■ We agree with the Supreme Court of Missouri that violations of the ICPC do not automatically result in dismissal. Instead, the trial court has the discretion to make a case-by-case determination based on the facts and circumstances before it. Some of the factors that a trial court should take into consideration are whether the violation (1) was knowingly committed by the adoptive parents or their attorney; (2) impaired the rights of a natural parent; (3) was more than a mere procedural technicality that adversely affected both the receiving and sending state's ability to determine the best interests of the child; (4) impeded the sending state's jurisdiction to determine the best interests of their children; (5) circumvented a sending state's laws in order to effectuate the adoption; and (6) was made to enhance the adoptive parent's ability to form emotional ties with the child in order to dictate adoption in the receiving state's courts. A major factor in every case, of course, is the best interests of the child.

We do not suggest that the trial judge is required to dismiss every adoption petition whenever there has been more than a *de minimis* violation of the ICPC. But the trial judge is required to consider and weigh numerous factors, including whether the constitutionally protected rights of a natural parent have been substantially impaired by the violation.

We believe that, under the facts and circumstances of this case, the trial court abused its discretion in denying appellant's motion to dismiss on grounds of a violation of the ICPC. Appellees or their attorney knowingly violated the ICPC by bringing Baby Girl S. into Maryland before Compact approval. There was absolutely no evidence below that either the New York State Compact Administrator or the Maryland Compact Administrator ever gave appellees permission to remove Baby Girl S. from New York. Instead, there was a letter sent by the Maryland Compact Administrator to appellees' attorney and the New York State Compact Administrator indicating

that Maryland still needed more information and had not approved the removal of Baby Girl S. from New York. Despite confirmation that they violated the ICPC, appellees continued to keep Baby Girl S. in Maryland. Even assuming, arguendo, that appellees did not know they originally violated the ICPC, the subsequent memorandum sent to their attorney clearly put them on notice. At that point, appellees should have returned Baby Girl S. to New York.

> An unlawful placement should be *rectified or terminated* immediately. [Emphasis in original.] Those who have perpetrated or participated in an unlawful placement should not be allowed to benefit from it. *Consequently, unless the placement can be converted to a legal one and this is done, the child should be removed from the placement and returned to the sending party in accordance with Compact.*

*In re Adoption of Jon K.*, 141 Misc.2d 949, 535 N.Y.S.2d 660, 662 (N.Y.Fam.Ct.1988) (quoting Secretariat Opinion, "Enforcement of the Interstate Compacts on the Placement of Children," April 1981, page iii) (emphasis in original). Moreover, appellees acknowledged at trial that they knew that appellant was objecting to the adoption. Such knowledge made it even more imperative that appellees remain in New York until a determination was properly made by the ICPC.

The illegal removal of Baby Girl S. from New York greatly impaired the rights of the natural father to have custody of Baby Girl S. Appellant's paternity action was substantially delayed, and the removal deprived appellant of the ability to develop emotional ties with Baby Girl S. and thus ultimately made it more difficult, under Maryland law, to object to the adoption. We conclude that the violation was not a mere technicality; it prevented the Maryland Compact Administrator and the New York State Compact Administrator from making a proper determination; it prevented both administrators from conducting further investigations that might have revealed appellant's objections; it deprived the State of New York of jurisdiction over a child born within its boundaries; and it ultimately led to a situation whereby sufficient time elapsed that the child's welfare seemingly dictated adoption.

We hold, therefore, that the trial court, under F.L. § 5–605, should have revoked appellees' "legal authorization" to bring Baby Girl S. into Maryland. Baby Girl S. was illegally brought into Maryland and should have been returned to New York in compliance with the ICPC.

As this Court held in *Bernhardt v. Lutheran Social Services*, 39 Md.App. 334, 344, 385 A.2d 1197 (1978), compliance with the ICPC is mandatory and its provisions should be enforced.

> Citizens of Maryland are, in our judgment, bound by the declared policy of the Compact and its provisions. No less is it an obligation of the courts of this jurisdiction to require that the provisions of the Compact be enforced and that the continuing jurisdiction of the "sending agency" be recognized, Md.Ann.Code, Art. 16 § 212A (a), *supra*, to the end that cooperation in the interstate placement of children may be achieved.

The Secretariat concluded his January 1993 opinion with a plea that courts take action to enforce the ICPC. One of the possible enforcements suggested by the Secretariat is dismissal of the adoption proceedings. The Secretariat explained:

> There is a mistaken notion that the only one exposed to harm in these cases is the innocent child. If it turns out that the adoptive parents are in fact satisfactory, many judges think it is worth winking at the law violations in the "best interests" of the individual child. But such a course produces many other victims. Some children who are not afforded the protection of prior investigation and evaluation required by ICPC come into inadequate and even downright dangerous homes. Some judges say (usually in oral statements from the bench) that allowing retroactive compliance in *this case* is not to be taken as a precedent. The attorneys may even be scolded for slipshod or wanton inattention to the law. But these cases are precedents. Lawyers and agencies learn from them that violations will get them and their clients what they want. An adoptive couple may never be back for another adopted child, but

they often help spread the word that a particular attorney or agency got them a child.

There are remedies that would substantially reduce or eliminate disregard of the child protective mechanisms of ICPC. Adoption agencies operate under licenses that could be revoked for violation of ICPC; Article IV of ICPC expressly provides for this. Attorneys are "officers of the court" and they too are licensed to practice. They too are amenable to judicial sanctions and to the loss of their licenses for disregard of the law and for advising clients to disobey.

Finally, it needs to be asked whether it is really good to make "an exception" of each case on the plea of the "best interests of the child." **It would not take many dismissals of adoption petitions and removal of children from homes in violation of placement laws to stop these efforts at evasion. They continue because failure to enforce the law encourages others to do likewise.**

*Secretariat Opinion* at 3.157–3.158 (emphasis added).

■ When a natural parent has been deprived of his or her baby by a violation of the ICPC, we fully and wholeheartedly agree that Maryland courts should enforce the ICPC, whenever appropriate. Maryland should not become a safe haven for those who illegally remove babies from foreign states in contravention of the Interstate Compact for the Placement of Children. Without enforcement of the ICPC, violations will continue to increase for numerous reasons. Violating the ICPC helps parties get around unfavorable state laws. If the sending state required the natural father's consent before adoption, while the receiving state did not, adopting parents could secure an advantage by wrongfully removing the child from the sending state and petitioning the receiving state to assume jurisdiction. One of the goals of the ICPC is the prevention of forum shopping. *In re Adoption No. 10087*, 324 Md. at 408, 597 A.2d 456 (citing *Hartfield* at 307). Moreover, allowing ICPC violations to continue can endanger the child's welfare. A child could be brought illegally into a state that

does not require stringent pre-investigation of the adoptive parents' home. The ICPC requires that the receiving state conduct an extensive pre-investigation before approving the sending of the child into the state.

We do not abrogate the "best interests of the child" standard. A close examination of the cases in which courts have excused a violation of the ICPC in "the best interests of the child" did not involve a natural parent objecting to the adoption. *See In re Adoption of Calynn, M.G.,* 137 Misc.2d 1005, 523 N.Y.S.2d 729 (Surr.Ct.1987); *In re Adoption Baby Boy M.G., Anonymous,* 135 Misc.2d 252, 515 N.Y.S.2d 198 (Surr.Ct.1987); *In re Adoption of Baby "E,"* 104 Misc.2d 185, 427 N.Y.S.2d 705, 706 (Fam.Ct.1980). We note that in *In re Adoption No. 10087,* the Court of Appeals was not faced with a situation in which a natural parent was objecting to adoption.

Commenting on appellant's plans for his daughter, which included acquiring his mother's house and starting a 401(K) plan, the trial judge characterized appellant as "immature in his outlook on life and grandiose in his thinking." Appellees, on the other hand, are mature, experienced foster parents, who are certainly far better able than appellant to provide the child with material benefits. Undoubtedly, those factors weighed heavily in the trial judge's determination of what was in Baby Girl S's best interests. Nevertheless, there is not a scintilla of evidence that appellant is not fit to be a father. Moreover, unlike other cases in which a mother changed her mind after the adoption, appellant **never** consented to the adoption. From the first indication that he was going to be a father, appellant expressed a desire to fulfill that role. The only possible reason that Baby Girl S.'s best interests might dictate adoption is that she has developed emotional ties with appellees. This has occurred, however, as a direct result of appellees' violation of the ICPC. We should not reward flagrant violations of the law under the guise of the best interests of the child. It is in situations such as this, when a child has developed emotional ties to adoptive parents as a result of the adoptive parents' violation of the ICPC and there

is a natural parent who has never consented to the adoption, that we hold that the ICPC should be enforced.

Continued violations of the ICPC will jeopardize the "best interests of the child." If adoptive parents illegally remove a child from the sending state without Compact approval, there is a risk that courts will rubber stamp the adoption merely because the child has developed emotional ties with the adoptive parents. Of course, if the home environment is dangerous, the court will most likely remove the child from the home. The child, however, will have spent the most critical formative years in a cruel and unsafe environment. Moreover, less than desirable homes may get through the system. That is unfortunate, because pre-investigation by the Compact Administrators could have revealed serious inadequacies in the prospective parent's home and the child could have been placed in a more suitable environment. We believe that violations of the ICPC are contrary to the "best interest of the child" and must be deterred.

The New York Family Court, in *In re Adoption of Jon K.*, 535 N.Y.S.2d 660 (Fam.Ct.1988), held that the "best interest of the child" standard should not preclude dismissals for violations of the ICPC. Recognizing that other New York State courts [2] have ignored violations of the ICPC under the best interests of the child standard under the doctrine of *"parens patriae,"* the New York Family Court enunciated in *In re Adoption of Jon K.* several reasons for not following that course. First, authority has been legislatively delegated to the Compact Administrator to determine the best interests of the child. The court noted that Compact Administrators have more information, mechanisms, personnel, and expertise to determine initially the best interests of the child. *Id.* at 662–63 (citing Secretariat Memorandum, "Judicial Responsibilities: The Interstate Compact on the Placement of Children, Adoption and 'The Best Interests of the Child,'" April 1988). It is

---

**2.** *See In re·Adoption of Baby Boy M.G. Anonymous,* 135 Misc.2d 252, 515 N.Y.S.2d 198 (Surr.Ct.1987); *In re Adoption of Baby E,* 104 Misc.2d 185, 427 N.Y.S.2d 705 (Fam.Ct.1980).

the Compact Administrator who has been "statutorily designated to act in the best interest of infants brought into the state who come within the provisions of the ICPC." *Id.* at 663. Concerned about other New York decisions that focus solely on the "best interests of the child" and ignore violations of the ICPC, the Court noted:

Concomitantly the executive role of the state as guardian and parens patriae, which also encompasses its responsibility to protect all dependant infants and incompetents under its general police powers and duty to provide for the general welfare is ignored by recent decisions.

*Id.* (citations omitted).

Second, the New York court pointed out that the Federal Constitution, Art. I, prohibits impairment of contracts between the states. *Id.* at 662. The ICPC is a compact between the states to enforce the proper placement of children out of state.

Third, the court ruled that it did not have jurisdiction over the child to make the best interests determination. The court stated:

I.C.P.C., Article III(a)(b) (*Conditions for Placement*) in effect establishes conditions precedent to a subject child's lawful establishment of residence in a signatory state by requiring compliance with each and every requirement of Article III "prior to placement in foster care or as a preliminary to a possible adoption". Non-compliance is determined in the sole discretion of the Administrator of the receiving state and return of the child to the state of origin is mandated unless approval of the Administrator is granted. This calls into question the court's jurisdiction over the child prior to administrative approval of residence in the state.

*Id.* at 663.

Finally, and most important, the Family Court ruled that violations of the ICPC will undermine its objectives of protecting the best interests of the child. The court dismissed the adoption petition, concluding "that the general welfare of children illegally transported over state lines will be promoted

by strict enforcement of the I.C.P.C. and the discouragement of its evasion." *Id.*

Allowing violations to continue under the best interest of the child exception is problematic; the exception swallows up the rule. Every time there is a violation of the ICPC, the adoptive parents will have bonded with the child, making adoption the most attractive course. Permitting the adoption will send a message to other adoptive parents that it is not only permissible but advantageous to violate the ICPC, thus eroding the credibility of the ICPC. Eventually, all that will remain of the ICPC is a gutted shell. Ironically, a Compact created and adopted to protect the best interests of the child will be trivialized into non-existence. In this case, unlike other cases that have ignored the violations of the ICPC for the sake of the child's best interests, there is a willing and able natural father who wants custody of the child. We cannot conclude that such placement is contrary to the child's best interests. In cases in which a child can be returned to a natural parent, a circuit court should enforce the spirit of the Interstate Compact for the Placement of Children.

■■■ We further hold that appellees' attorney's fees should have been denied. In *In re Adoption of Calynn, M.G.,* 137 Misc.2d 1005, 523 N.Y.S.2d 729 (Surr.Ct.1987), a New York State court held that a denial or reduction of attorney fees may be an appropriate sanction for violations of the ICPC. The Court of Appeals in *In re Adoption No. 10087,* 324 Md. at 414, 597 A.2d 456, noted that that approach was an "innovative remedy." In the case *sub judice,* appellees' attorney was the one who wrongfully indicated that the Compact Administrators approved the adoption. Therefore, in enforcing the provisions of the ICPC, we direct that appellees' attorney's fees be denied.

Reversal of the decree of adoption for violation of the ICPC makes it unnecessary to resolve appellant's third issue. We choose to address it, nevertheless, because our belief that the

trial court erred in finding that it was in the best interests of the child to terminate appellant's parental rights reinforces our conclusion that, in this case, the adoption petition should have been dismissed.

## III

The standard of review of a trial court's decision in adoption proceedings is whether the trial court abused its discretion or "whether the findings of fact by the trial court were clearly erroneous." *In re Adoption No. 11137,* 106 Md.App. 308, 314, 664 A.2d 443 (1995). Although the over-riding consideration in adoption cases in Maryland is the best interests of the child, "the rights of the natural parent or parents ... must be as carefully guarded as those of the child; the right to raise one's own child, 'recognized by constitutional principles, ... is so fundamental that it may not be taken away unless clearly justified.'" *Id.* at 314, 664 A.2d 443 (quoting *In re Adoption/Guardianship No. 10941,* 335 Md. 99, 112, 642 A.2d 201 (1994)).

> For that reason, there is a presumption that a child's interests will be best served in the care of the natural parent. "The justification for this presumption is the belief that the parent's natural affection for the child creates a greater desire and effort to properly care for and rear the child than would exist in an individual not so related." *In re Adoption No. A91–71A,* 334 Md. 538, 560, 640 A.2d 1085 (1994) (citing *Melton v. Connolly,* 219 Md. 184, 188, 148 A.2d 387 (1959)). *See Lloyd v. Schutes,* 24 Md.App. 515, 522, 332 A.2d 338 (1975). The rights of the natural parent or parents, as we have said, are subject to the best interests of the child. *Courtney v. Richmond,* 55 Md.App. 382, 392, 462 A.2d 1223 (1983). It is because "the parental rights of the natural mother and father ... [are] 'far more precious than property rights' ... [that they are] protected by the due process clause of the Fourteenth Amendment." *In re Adoption No. 85365027/AD,* 71 Md.App. 362, 366, 525 A.2d

1081 (1987) (quoting *Stanley v. Illinois,* 405 U.S. 645, 649, 92 S.Ct. 1208, 1211, 31 L.Ed.2d 551 (1972)).

*Id.* at 316, 664 A.2d 443 (alterations in original).

Adoption in Maryland is a statutory creature finding no origin at common law. *Id.* at 320, 664 A.2d 443. Md.Code (1984, 1991 Repl.Vol., 1995 Supp.) §§ 5–311 and 5–312 of the Family Law Article (F.L.) provide the two methods by which adoption may be accomplished in Maryland. F.L. § 5–311 deals with consent adoptions; in general, an individual may not be adopted without the consent of the natural mother, natural father, and the individual, if the individual is at least 10 years of age.

F.L. § 5–312 allows for adoption of a child when consent of a natural parent is affirmatively withheld by the filing of a notice of objection. The statute allows adoption without consent when four criteria are independently met. Subsection (b) provides:

> Without the consent of the child's natural parent, a court may grant a decree of adoption to a stepparent, relative, or other individual who has exercised physical care, custody, or control of a child for at least 6 months, if by clear and convincing evidence the court finds that:
>
> (1) it is in the best interest of the child to terminate the natural parent's rights as to the child;
>
> (2) the child has been out of custody of the natural parent for at least 1 year;
>
> (3) the child has developed significant feelings toward and emotional ties with the petitioner; and
>
> (4) the natural parent;
>
> > (i) has not maintained meaningful contact with the child during the time the petitioner has had custody despite the opportunity to do so;
> >
> > (ii) has repeatedly failed to contribute to the physical care and support of the child although financially able to do so;
> >
> > (iii) has been convicted of child abuse of the child; or
> >
> > (iv) has been:

1. convicted of a crime of violence, as defined in Article 27, § 643B of the Code, against the other natural parent; and

2. sentenced to a term of imprisonment for at least 10 years and, if any portion of the sentence is suspended, the unsuspended portion of which is at least 10 years.

The four criteria are conjunctive; all must be met in order to permit adoption without consent. The Legislature placed an important restriction on the evaluation of the four criteria in § 5–312(d).

(d) *Limitation.*—A court may not grant a decree of adoption under this section solely because a natural parent:

.    .    .    .    .

(2) has been deprived of custody of the child by the act of the other natural parent.

We hold that the trial court did not properly follow that limitation. Baby Girl S. had been out of the custody of appellant for at least one year and had developed significant feelings and emotional ties with appellees. As a result, her best interests seemingly dictated adoption. None of this, however, would have occurred but for the natural mother's fraudulent actions that kept Baby Girl S. away from appellant.

Judge Whitfill found that the adoption decree was not granted solely because the natural mother deprived appellant of custody. He stated:

Appellant did not ask natural mother for custody. Appellant made no arrangements with natural mother for the support of the child. Natural mother decided that she had to take steps to take care of this child since appellant was showing no willingness to provide for the child. She consulted her social worker and decided upon a plan of adoption. Appellant left natural mother to depend upon public assistance and herself to take care of this child. Therefore, natural mother was not acting to deprive appellant of contact when she made a decision to place the child for adoption. She was acting in a responsible way under a difficult

set of circumstances to provide for this child. Appellant up to this point has acted irresponsibly by not formulating plans to care for the child and not having provided any assistance to natural mother during her pregnancy. Appellant did not request custody or offer to care for the child himself.

.        .        .        .        .

In fact, appellant intended to let natural mother struggle with the child, and draw public assistance while he and his mother thought about the issue. The child cannot wait. The child requires immediate and proper loving care. Under the circumstances natural mother made a reasonable decision to care for that child's needs. That decision impacted upon appellant's future access to the child. However, appellant had abandoned his rights to make demands when he had failed to step forward to help care for the child's needs on a prenatal basis as well as after it was born.

All of the findings of the trial judge set forth above, which we are obligated to accept, amply support the conclusion that the natural mother was justified in putting the baby up for adoption instead of relying on appellant for support and assistance in raising her. But they do not justify the natural mother's deceiving the New York Compact Administrator and the Surrogate Court as to the identity of appellant as the child's father. Certainly nothing can excuse the grossly reprehensible conduct of the lawyer hired by appellees to represent the natural mother, who assisted the natural mother in deceiving the Surrogate Court and, in effect, withheld notice of the Surrogate Court proceedings from appellant. But for the natural mother's fraudulent conduct, which precipitated the removal of Baby Girl S. from New York while appellant's filiation case was pending, the Dutchess County Family Court would have exercised its exclusive jurisdiction over all matters concerning custody, visitation, and support of Baby Girl S. Appellant petitioned that court for custody of his daughter immediately after he was determined to be the baby's father, and the Family Court awarded him custody. By that time, however, because of the natural mother's false pleadings and

affidavits in the Ulster County Surrogate's Court and her failure to notify appellant of the proceedings in that court, the child had already been removed from New York. Consequently, appellant was deprived of custody solely because of the natural mother's actions. And since the adoption decree could not have been granted without a finding that the child had been out of appellant's custody for at least one year (F.L. § 5–312(b)(2)), the court could not have granted the adoption decree had it not been for the natural mother's conduct that deprived appellant of custody. Therefore, the trial judge's assertion that the adoption decree was not granted solely because the natural mother deprived appellant of custody is not correct; despite all of his other findings and conclusions, he could not have issued the adoption decree if the natural mother had not deprived appellant of any opportunity to obtain custody of his daughter. F.L. § 5–312(d)(2).

Furthermore, we believe that the trial judge wrongly focused his attention on appellant's failure to provide financial support for the mother before the birth of Baby Girl S. F.L. § 5–312 focuses on whether appellant provides support for the baby, not the mother. We further disagree with Judge Whitfill's conclusion that appellant failed to assume responsibilities of fatherhood. Indeed, the uncontroverted evidence overwhelmingly indicates quite the opposite.

There is not a scintilla of evidence throughout the lengthy transcript indicating that appellant did not want to assume the role of father. Appellant was not even informed by the natural mother about the pregnancy until either three or five months after conception. When first hearing that he was going to be a father, appellant demonstrated immediate recognition of his obligations of support by responding, "If you say I am the father, I am the father. I will live up to my responsibilities." Appellant took the natural mother to the doctor's office on two or three occasions. Moreover, appellant took the natural mother to his home to meet his family. These facts, which were undisputed, established appellant's admittance, recognition, and acceptance of his responsibility to the child. There is absolutely no evidence that appellant's

family was not open, warm, and friendly. In fact, appellant's mother invited the natural mother to live with the family in their three-bedroom townhouse.

The trial judge commented that appellant's mother, foster brother, biological brother, biological brother's girl friend and baby, already lived at the townhouse. Those findings are not supported by the record. Appellant's mother testified that only appellant and his foster brother live in the townhouse. Appellant's biological brother and the brother's girl friend and baby have their own place. Additionally, we find no support in the record for the court's conclusion that appellant's home is less than desirable. A videotape of the home was introduced into evidence. The videotape demonstrated a spacious, clean, and well kept three bedroom townhouse in a nice suburban neighborhood. Even assuming that appellant must share a bedroom with his younger foster brother, we do not perceive that the physical environment is thereby rendered "less than desirable."

It was the natural mother, and not appellant, who became aloof two months prior to the birth. The natural mother testified that she did not want to see appellant anymore. Appellant, on the other hand, wanted to see the natural mother and assume responsibility for Baby Girl S. On numerous occasions, appellant approached the natural mother's home only to be turned away by the natural mother's parents. As soon as he heard of Baby Girl S.'s birth, appellant attempted to visit the child and her mother at the hospital, but was escorted out of the hospital by security guards. Appellant never had an opportunity to see his own child. Desiring a role in raising Baby Girl S., appellant promptly filed an action for declaration of paternity in New York Family Court, Dutchess County. While many fathers in similar circumstances would deny paternity in order to avoid financial obligations to support the child, appellant was at the courthouse four days after the birth of Baby Girl S. saying, "I want to assume responsibility for my child."

After Baby Girl S.'s birth, appellant made numerous attempts to see the natural mother and the child but again was turned away by the natural mother's parents. The natural mother did not want to have anything to do with appellant, and repeatedly avoided him. Appellant was not even aware until long after the fact that his daughter had been put up for adoption and removed from New York by appellees. Appellant was not served with notice of the consent proceedings before the New York Surrogate Court, Ulster County. It was more than six months later that appellant learned of appellees' identity when they contacted him to set up a meeting. Appellant never consented to the adoption. Even when appellees met appellant at a diner in New Paltz, New York, appellant made abundantly clear that he was opposing the adoption and wanted to raise his own child.

Appellant relied on the legal system to his detriment. He filed an action for declaration of paternity four days after the child's birth, but was not given an order of filiation until thirteen months later because appellees canceled several blood tests. Apparently perceiving that appellees would not accept any support from him or allow him to visit Baby Girl S., appellant believed that his only recourse was through the court system. Refusing to consent to the adoption, appellant retained counsel in Maryland and in New York to oppose it. Time passed, and by the time the adoption proceeding was heard in Harford County Circuit Court, Baby Girl S. was almost two years old. The trial judge then took an inordinate amount of time to decide the case; Baby Girl S. was almost three when the circuit court issued the adoption decree.

We believe that appellant's actions were utterly inconsistent with a conclusion that he was a father who did not want the responsibilities of fatherhood. The trial judge's conclusion that appellant's actions were "not substantial steps toward actually caring for the child" was clearly erroneous, the evidence being overwhelmingly to the contrary.

Appellant's desire to raise his child was illustrated by his testimony:

First of all, I mean, anybody that has been in my situation, you can't really explain. It's hard to explain. It's hard to understand the way I feel, to know that you have a daughter out there, a little girl, that does not even know who her real father is, and natural mother not being there for her day in and day out, not knowing what she's doing.

First of all, I never saw her walk. I mean, I never saw her take her first step. It's emotional—it's just a feeling that I wouldn't put my worst enemy through. I mean, to lose your daughter and to go through these procedures, dragging on and on, I lost two years of my daughter's life. I don't want to lose any more.

I feel as though I have every right in the world, in the law system, to have my daughter. I feel as though I could give her just as much love, financial, physical, mental, whatever it takes, to raise my daughter. She is well provided for. There is no problem there.

The adoption statute requires both parents' consent in order to effectuate an adoption. Section 5–312 created an exception, allowing a nonconsensual adoption only when the four previously discussed criteria are met. It is clear from the language of the statue that the General Assembly did not want to deprive a natural parent of the rights of parenthood solely because the other natural parent wanted it that way. Appellant has always unequivocally stated that he wants to raise his daughter; the natural mother's actions have deprived him of that right. "[B]ecause of the harsh consequences of a decree of adoption we have often said that it will not be granted over parental objection unless it is clearly warranted." *In re Adoption No. 11137,* 106 Md.App. at 328, 664 A.2d 443 (quoting *Dawson v. Eversberg,* 257 Md. 308, 313, 262 A.2d 729 (1970)).

We conclude, therefore, that the trial court erred in granting the decree of adoption without appellant's consent and over his objection. We would reverse for that error were we not reversing and directing dismissal of the adoption petition for violation of the ICPC.

For the reasons set forth above, the judgment of the circuit court is reversed and the case is remanded for entry of an order dismissing the adoption petition.

JUDGMENT REVERSED AND CASE REMANDED FOR ENTRY OF AN ORDER DISMISSING THE PETITION FOR ADOPTION.

COSTS TO BE PAID BY APPELLEES.

HOLLANDER, Judge, dissenting.

This is most assuredly a painful case. Indeed, no "Solomonic" solution is available as we try to resolve this profoundly difficult matter, in which we consider the interests of the biological father, the adoptive parents, and Baby Girl S. The panel majority acknowledges that, in a case involving a violation of the Interstate Compact for the Placement of Children ("ICPC"), "the trial court has the discretion to make a case-by-case determination based on the facts and circumstances before it." *Maj. op.* at 503. I respectfully dissent because, upon review of the trial judge's painstaking, well-reasoned, sixty-three page opinion, it is evident that his factual findings are not clearly erroneous and that he did not abuse his discretion. Therefore, his decision should be affirmed.

I.

Balancing all the facts, circumstances, and equities, the trial court was entitled to conclude that the ICPC violation was unintentional and that it did not warrant dismissal of the adoption petition. In making this decision, the trial judge did not err.

The panel majority correctly observes that "[a] major factor in every case, of course, is the best interests of the child." *Maj. op.* at 503. Indeed, as the Court of Appeals said in *In re Adoption No. 10087,* 324 Md. 394, 411, 597 A.2d 456 (1991), the seminal Maryland case on the ICPC, "The 'golden rule' of adoption in Maryland is, and has always been, the best interest of the child." In its resolution of the ICPC violation, however, the majority essentially concludes, as a matter of

ICPC policy, that the "best interest of the child" is actually the best interest of children in general, as opposed to the particular child before the court. For example, the majority states: "Continued violations of the ICPC will jeopardize the 'best interests of the child.' ... [V]iolations of the ICPC are contrary to the 'best interest of the child' and must be deterred." *Maj. op.* at 508. The panel majority also relies on the opinion of the New York Family Court that " 'the *general welfare* of children illegally transported over state lines will be promoted by strict enforcement of the I.C.P.C. and the discouragement of its evasion.' " *Maj. op.* at 510, quoting *In re Adoption of Jon K.,* 141 Misc.2d 949, 535 N.Y.S.2d 660, 662 (N.Y.Fam.Ct.1988) (emphasis supplied). Thus, although the majority contends otherwise, *see maj. op.* at 503, the upshot of its analysis is that, for anything other than a *de minimis* ICPC violation, prophylactic dismissal of an adoption petition is required.

Certainly, the importance of enforcement of the ICPC cannot be overstated. But "[t]he fact that the ICPC had been violated in this case does not mandate dismissal; rather it indicates the need for a prompt determination of the best interest of *this* child." *In re Adoption No. 10087,* 324 Md. at 412, 597 A.2d 456. (Emphasis supplied). Therefore, the proper focus here is not the interest of a hypothetical child. Rather, we must focus upon the interests of Baby Girl S.

Clearly, the trial court must have discretion to balance the type and gravity of an ICPC violation with the child's best interests, in light of all the facts and circumstances in the particular case. "Discretion" has been defined as "a reasoned decision based on the weighing of various alternatives." *Judge v. R and T Construction Co.,* 68 Md.App. 57, 60, 509 A.2d 1236 (1986). "[W]hen the consequences of a particular exercise of discretion are clear, *i.e.,* one result is *clearly* unjust and the other, *clearly* not, the limits of the exercise of discretion are narrow." *Thodos v. Bland,* 75 Md.App. 700, 712, 542 A.2d 1307 (1988) (emphasis supplied). But "when the consequences are not so clear, *i.e.,* no result is clearly just or unjust, the limits of the exercise of discretion are considerably

broader." *Id.* In such a situation, "we will not find an abuse of discretion whichever way the trial court may choose to exercise discretion." *Id.*

While the majority recognizes the discretion vested in the trial court, it nonetheless rejects Judge Whitfill's exercise of that discretion under the guise of abuse. Appellate review of discretionary decisions is deferential, however. As the Court of Appeals stated almost half a century ago, questions within the discretion of the trial court "are much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred." *Northwestern National Insurance Co. v. Samuel R. Rosoff, Ltd.,* 195 Md. 421, 436, 73 A.2d 461 (1950). *See also Petrini v. Petrini,* 336 Md. 453, 469–70, 648 A.2d 1016 (1994) (child custody determinations reviewed for abuse of discretion). That the ICPC does not contain a penalty provision applicable to the facts of this case is yet another reason why we should uphold the trial court's determination not to dismiss the adoption petition.

Judge Whitfill's thorough opinion evidences that he considered the evidence, the issues, and the equities.[1] He expressly found that any violation of the ICPC was unintentional and unknowing, that the biological father's legal rights had been protected, and that neither Maryland nor New York had any interest that would be served in dismissing the petition. He also specifically found that the adoptive parents acted in "good faith" in bringing Baby Girl S. to Maryland only *after* they were orally advised that the compact administrator had approved the placement of the child in Maryland.[2] In addition,

---

1. While there are, of course, inordinate time pressures upon the trial court, it is regrettable that so many months elapsed from the time the trial ended until the time that the court issued its opinion.

2. The adoptive mother testified:

   [APPELLEES' COUNSEL]: Did you understand the Compact Administrator did clear it for you are [sic] to return to Maryland?

he pointed to the fact that appellees hired an attorney in New York to file the appropriate documents to obtain compact approval, which were then transmitted to Maryland. Further, the New York compact office apparently asked the Maryland compact office to *call* with a *verbal* approval, which was consistent with appellees' version that they were orally advised of the approval to bring the baby to Maryland. Moreover, in the letter from Sharon Hackett, Maryland's Interstate Compact administrator, to New York's Administrator, dated May 27, 1992, the bringing of Baby Girl S. to Maryland was described as "a mixup." Finally, Judge Whitfill found that appellees were already an approved foster family and "had actually had foster children placed in their home."

Judge Whitfill's findings on this issue are clear:

We therefore find that it is uncontradicted that [appellees] employed an attorney to file for Interstate Compact approval, that the application was transmitted to the State of Maryland Compact Administrator, that the baby was not moved from New York to Maryland until [appellee] had been verbally advised that compact approval had been given, that [appellee] relying in good faith upon that communication brought the baby to Maryland, that [appellees] had been previously approved as a suitable home for placing foster children and that [appellees] are in fact ... suitable parents for a placement of a child such as the one in question.

We believe that the Court of Appeals in *Re Adoption 10087,* 324 Md. 394, 597 A.2d 456 (1991) has instructed us

APPELLEE MOTHER: Yes.

\* \* \* \* \* \*

[APPELLANT'S COUNSEL]: Did you get permission from Maryland to bring the child here?

APPELLEE MOTHER: Yes. Why do you think I stayed in New York City for two weeks? I stayed in New York until I had approval to come down here.

The trial judge was entitled to believe the testimony of the adoptive mother. *See Hale v. Hale,* 74 Md.App. 555, 569, 539 A.2d 247 *cert. denied,* 313 Md. 30, 542 A.2d 857 (1988) ("Assessing the credibility of witnesses is the role of the trial court, not the appellate court.").

that *under these circumstances we should not return the baby to the State of New York while the wheels of bureaucracy grind.* Section 5–602 of the Family Law Article tells us that one of the purposes of the act is to see that each child requiring a placement receives maximum opportunity to be placed in a suitable environment with persons having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care. That purpose has certainly been met in this case.

*We find that the petitioners acted in good faith.* We find that the interest of the child would not be served by returning the child to New York until the compact approval is given. Further we find no interest in the State of Maryland that overrides the best interests of the child. The State of Maryland was aware of this proceeding and has asserted no interest that needs to be protected *vis a vis* this particular child. We therefore conclude, in light of *In re Adoption 10087*[,] that the failure to complete the Interstate Compact process, is not a bar to this adoption.

(Italics added; underlining in original).

Moreover, as shall be discussed in more detail, *infra,* the court concluded that Baby Girl S. should not suffer for the cause of the ICPC. In reaching that decision, Judge Whitfill considered appellant's conduct and the testimony of the court-appointed expert regarding the probable trauma to the child if she were uprooted. Judge Whitfill thus said:

*Therefore, when it comes to considering the conduct of [natural mother] versus the conduct of [appellant] we do not feel that [appellant] is entitled to complain. The only reason this child should be moved from the home of [appellees] to the home of [appellant] is to correct some injustice perpetrated on [appellant] by [natural mother], [appellees], or one or more of the State authorities.* Although [natural mother] was not totally truthful when she denied knowledge of the whereabouts of [appellant], she was *not* perpetrating an injustice upon him. Further, neither the State of New York nor the State of Maryland has denied him any substantial right. He simply did not move quickly enough to

plan for and provide a home for an infant child. Someone else is now doing that task and doing it well. *It would be a grave injustice to the child to require her to break the bonds she has established with the [appellees] to correct any injustice we might perceive as having been done to [appellant].*

(Emphasis supplied).

The court's decision rests on factual findings supported by the record and represents an appropriate exercise of discretion, "a reasoned decision based on the weighing of various alternatives." Yet the majority engages in appellate fact finding and then substitutes its judgment for that of Judge Whitfill. For example, the majority disregards the evidence that appellees acted in good faith and finds as a fact that the ICPC was violated "knowingly" by either appellees or their attorney. *Maj. op.* at 503.[3]

While there is certainly evidence in the record that "[t]he illegal removal of Baby Girl S. from New York greatly impaired the rights of the natural father to have custody of Baby Girl S.," *maj. op.* at 504–505, the trial court relied on evidence that cuts the other way. For example, appellees filed their petition for adoption less than three weeks after the child's birth. They duly named appellant as the natural father, noted that his consent had not been obtained, and provided his full name and address to the court. Within less than one month, the court issued to appellant the first of four show cause orders. With respect to the initial attempt to serve him,

---

3. The majority asserts that the adoptive parents *falsely* asserted in the adoption petition, filed on May 22, 1992, that they had complied with the ICPC and were awaiting approval to bring the child to Maryland. It points, *inter alia,* to the adoptive father's testimony that the child was brought to Maryland on or before May 18, 1992. The petition was signed by the adoptive parents under penalties of perjury, but the record extract does not reflect the date on which it was signed. Certainly, the date of filing by appellees' attorney does not necessarily correspond to the date the petition was signed; appellees' statements may well have been true when made. Moreover, the adoptive mother specifically testified that she remained in New York for two weeks and did not proceed to Maryland until advised that it was lawful for her to do so. The court found her testimony credible.

appellant failed on several occasions to claim his certified mail. Subsequently, a private process server made repeated attempts to serve appellant, but appellant never returned the process server's telephone calls. Ultimately, almost an entire year elapsed before service was achieved upon appellant.

Additionally, the trial court considered that appellant personally spoke with appellees' Maryland attorney in September 1992 and met with appellees in New York in November 1992. It is thus undisputed that, months before appellant was served, and while Baby Girl S. was still an infant, appellant had actual knowledge of the adoption proceedings in Maryland. Yet he never filed an objection to the adoption until June 1993. Moreover, appellant did not file an action for custody until March 1994; by that time, the child was twenty-two months old. Further, he did not file for visitation until September 1994, after the trial in Maryland had already concluded.

The foregoing establishes that Judge Whitfill reasonably concluded that Baby Girl S. should not be made a martyr for the ICPC. His decision was an appropriate exercise of judicial discretion and should be affirmed.

## II.

I disagree with the panel majority's conclusion that Judge Whitfill erred by terminating appellant's parental rights and approving the adoption. The majority correctly notes the fundamental right of a biological parent to raise his or her own child. *See maj. op.* at 511. But the case law has also established that there are occasions in which the natural parent's right to raise the child must yield to the child's best interests. What the New York Court of Appeals stated in the oft-cited case of *Bennett v. Jeffreys*, 40 N.Y.2d 543, 546, 387 N.Y.S.2d 821, 824–25, 356 N.E.2d 277, 281 (1976), is pertinent here:

The day is long past in this State, if it had ever been, when the right of a parent to the custody of his or her child,

*where the extraordinary circumstances are present,* would be enforced inexorably, contrary to the best interest of the child, on the theory solely of an absolute legal right. Instead, in the extraordinary circumstance, when there is a conflict, the best interest of the child has always been regarded as superior to the right of parental custody. Indeed, analysis of the cases reveals a shifting of emphasis rather than a remaking of substance. *This shifting reflects more the modern principle that a child is a person, and not a subperson over whom the parent has an absolute possessory interest.* A child has rights too, some of which are of a constitutional magnitude....

(Emphasis supplied).

In *Ross v. Hoffman,* 280 Md. 172, 372 A.2d 582 (1977), which involved a custody contest between a parent and third-parties who had extensively cared for the child, the Court adopted the principle enunciated in *Bennett.* It said: "Our decisions make clear ... that the right of a parent to the custody of the child would not be enforced inexorably, contrary to the best interest of the child, on the theory of an absolute legal right." 280 Md. at 176, 372 A.2d 582. Thus, it is firmly settled in Maryland that, "while the parents are ordinarily entitled to the custody of their minor children by the natural law, the common law, and the statute, this right is not an absolute one, but may be forfeited where it appears that any parent is unfit to have custody of a child, *or where some exceptional circumstances render such custody detrimental to the best interests of the child.*" *Ross v. Pick,* 199 Md. 341, 351, 86 A.2d 463 (1952) (emphasis supplied). *Accord Ross v. Hoffman,* 280 Md. at 178–79, 372 A.2d 582; *Lipiano v. Lipiano,* 89 Md.App. 571, 577, 598 A.2d 854 (1991), *cert. denied,* 325 Md. 620, 602 A.2d 710 (1992); *Boothe v. Boothe,* 56 Md.App. 1, 466 A.2d 58 (1983). *See generally* John F. Fader, II & Richard J. Gilbert, MARYLAND FAMILY LAW § 5–5 (2nd ed. 1995).

These principles apply with full force in the adoption context. In *In re Adoption No. A91–71A,* 334 Md. 538, 640 A.2d 1085 (1994), the Court recognized that, although the decision

on whether to grant an adoption petition must "be made with due regard to the rights of the natural parent,"

> we have also made clear that the controlling factor, or guiding principle, in adoption and custody cases is not the natural parent's interest in raising the child, but rather what serves the interests of the child.... We have said that in all cases where the interests of a child are in jeopardy the paramount consideration is what will best promote the child's welfare, a consideration that is of transcendant importance.

*Id.,* 334 Md. at 560, 561, 640 A.2d 1085 (citations and internal quotation marks omitted).

In the case before us, Judge Whitfill explicitly found that "extraordinary circumstances" were present, and that they warranted the granting of appellees' petition for adoption. His decision was not based only on his assessment of appellant's unfitness as a parent; rather, he also concluded that this case presents exceptional circumstances within the meaning of *Ross v. Hoffman* and *Bennett v. Jeffreys.* The trial court stated in its opinion:

> We find that there are exceptional circumstances why the child should not be turned over to her biological father which include his failure to develop a plan for the care of the child prior to the child's birth, his failure to provide for medical care for the mother prior to the child's birth, his failure to provide care and support for the child since the time of its birth, his lack of capacity to meet the needs of the child and the fact that the child is well bonded to the petitioners and has no bond to the respondent. These factors are independent of anything that the natural mother did.

In my view, Judge Whitfill's decision rests upon factual findings that are not clearly erroneous. Nor did the court abuse its discretion. Therefore, the trial court's decision should not be disturbed.

Md.Code (1984, 1991 Repl.Vol.), § 5–312(b) of the Family Law Article ("F.L."), contains the criteria for an independent

adoption when a natural parent objects. Under this provision, the child must have been in the "physical care, custody, or control" of the petitioner for at least six months and the court must first find by clear and convincing evidence that *each* of the following criteria is met: (1) "it is in the best interests of the child to terminate the natural parent's rights as to the child" (F.L. § 5–312(b)(1)); (2) "the child has been out of the custody of the natural parent for at least 1 year" (F.L. § 5–321(b)(2)); and (3) "the child has developed significant feelings toward, and emotional ties with, the petitioner" (F.L. § 5–312(b)(3)). Fourth, the court must also find, by clear and convincing evidence, that *at least one* of the following three criteria is met: (a) the natural parent "has not maintained meaningful contact with the child during the time the petitioner has had custody despite the opportunity to do so" (F.L. § 5–312(b)(4)(i)); (b) the natural parent "has repeatedly failed to contribute to the physical care and support of the child although financially able to do so" (F.L. § 5–312(b)(4)(ii)); or (c) the natural parent "has been convicted of child abuse of the child" (F.L. § 5–312(b)(4)(iii)).[4]

The issue of the child's best interests, embodied in F.L. § 5–312(b)(1), occupied much of the trial court's analysis.[5] Central to the court's decision is its unflinching conclusion that the best interest of Baby Girl S. compels termination of appellant's parental rights and approval of the adoption. Indeed, the court unequivocally concluded that "[t]here is no question in our mind that it is in the best interest of the child that she remain with appellees." [6] The trial court did not err in its consideration of F.L. § 5–312(b).

---

4. After the trial court rendered its decision, the General Assembly enacted F.L. § 5–312(b)(4)(iv).

5. It is undisputed that "the child has been out of the custody of the natural parent for at least 1 year" and had been in the custody of the petitioners for at least six months. Therefore, these factors need not be addressed.

6. Judge Whitfill was overwhelmingly convinced that his decision regarding the best interests was correct. He said:

It is the trial judge's function to resolve conflicts in the evidence. His factual findings should not be disturbed unless they are "clearly erroneous." *See In re Adoption No. A91-71A, supra,* 334 Md. at 564, 640 A.2d 1085; *Wamsley v. Wamsley,* 333 Md. 454, 462, 635 A.2d 1322 (1994). *See also Styka v. Styka,* 257 Md. 464, 469, 263 A.2d 555 (1970) (where trial judge, who was presented with two essentially different stories, saw witnesses and heard them testify, reviewing court could not say that his judgment as to the witnesses' credibility was clearly erroneous); *Kerber v. Kerber,* 240 Md. 312, 316–17, 214 A.2d 164 (1965); *Thurlow v. Thurlow,* 212 Md. 222, 227, 129 A.2d 170 (1957); *Sullivan v. Sullivan,* 199 Md. 594, 600–01, 87 A.2d 604 (1952); *Fantasy Valley Resort, Inc. v. Gaylord Fuel Corp.,* 92 Md.App. 267, 275, 607 A.2d 584, *cert. denied,* 328 Md. 237, 614 A.2d 83 (1992) (weighing of evidence and credibility of witnesses are matters for trial court, and will not be disturbed on appeal unless clearly erroneous).

In resolving conflicts in the evidence, it is the trial judge's prerogative to draw reasonable inferences from the evidence presented. *See Mercedes–Benz v. Garten,* 94 Md.App. 547, 556, 618 A.2d 233 (1993) (in reviewing the lower court's factual findings, we will assume the truth of all evidence, and *all reasonable inferences therefrom,* that support the court's decision); *Holly v. Maryland Auto Insurance Fund,* 29 Md.App. 498, 506, 349 A.2d 670 (1975) (trial court's conclusion must stand if there is any competent, material evidence that directly *or by reasonable inference* tends to justify that conclusion). *See also Larmore v. Larmore,* 241 Md. 586, 589, 217 A.2d 338 (1966). Moreover, we must uphold the trial judge's decision unless he has abused his discretion. *See In re Adoption No. 11137,* 106 Md.App. 308, 314, 664 A.2d 443 (1995). As I see it, Judge Whitfill's decision passes muster on all fronts.

---

Had the only issue in this case been the question of best interests of the child, we would have decided the matter from the bench the day the trial was completed. Our concerns have run not to the issue of best interests of the child but to the impact of our decision upon the legal rights of [appellant].... It is the concern for his legal rights ... that has caused us to struggle with this matter.

A review of the record establishes that the court's decision was well founded. To establish and underscore the trial court's careful consideration of the evidence and its proper exercise of discretion, I must rely heavily on the trial court's opinion.

The natural mother testified that, during her pregnancy, appellant was uninterested, did not provide financial or other support for her (beyond taking her to the doctor twice), and did not try to develop a plan for the care or raising of the couple's child.[7] Judge Whitfill believed the natural mother's

---

7. The following testimony of the natural mother is relevant:

[APPELLEES' COUNSEL]: Did he ever offer any support to you during the pregnancy?
NATURAL MOTHER: He offered a couple of times, *but all he did was offer. He never did anything.*
[APPELLEES' COUNSEL]: Tell me what he said when he made the offers?
NATURAL MOTHER: He would say "I could take you to the doctors." That was about it.
[APPELLEES' COUNSEL]: Did he ever offer to provide you with any financial support?
NATURAL MOTHER: His mother did. She said I could live with them, but that's all she said.
[APPELLEES' COUNSEL]: Did she offer you any money?
NATURAL MOTHER: No.
[APPELLEES' COUNSEL]: Did [appellant] ever say you could live at his house?
NATURAL MOTHER: I don't believe he did, no.

                  *    *    *    *    *    *

[APPELLEES' COUNSEL]: You said he offered to take you to the doctor. Did he, in fact, take you to the doctor?
NATURAL MOTHER: Only twice.

                  *    *    *    *    *    *

[APPELLEES' COUNSEL]: Why didn't you want to see him?
NATURAL MOTHER: Because I made up my mind what I wanted to do with the child.

                  *    *    *    *    *    *

[APPELLEES' COUNSEL]: How did you come to choose adoption for the child?
NATURAL MOTHER: *I knew I didn't have any support from him because he always said he would do things, but he never did.* I didn't have any money. I was still in school.

version of events. Indeed, he said that the mother "impressed us as a sincere young lady," and he added, "We accept as true her characterization of [appellant] as not providing anything other than talk toward the care and planning for care of the baby." On the other hand, the court did not find appellant particularly credible. For example, the court noted that appellant "has alternately claimed an ability to provide properly for the child and to be indigent. In fact, he provided nothing toward the financial support of the child or toward the physical care of the child."

Appellant's failure to support the mother of the couple's child during pregnancy, or to make any plans for the child's future, indicated to the court that appellant was unwilling to assume, or incapable of assuming, the responsibilities of parenthood. The majority says, "[W]e believe that the trial judge wrongly focused his attention on appellant's failure to provide financial support for the mother before the birth of Baby Girl S. F.L. § 5-312 focuses on whether appellant provides support for the baby, not the mother." *Maj. op.* at 515.

---

(Emphasis supplied).

\* \* \* \* \* \*

[APPELLANT'S COUNSEL]: Why didn't you want him to see the baby or you?

NATURAL MOTHER: Because he wasn't interested, so *he hasn't called me in three or four months,* so I didn't want him to see the baby.

[APPELLANT'S COUNSEL]: It was his child?

NATURAL MOTHER: He didn't do anything throughout my pregnancy.

\* \* \* \* \* \*

[APPELLANT'S COUNSEL]: Why did he take you twice [to the doctor]?

NATURAL MOTHER: He stopped.

[APPELLANT'S COUNSEL]: If he didn't care, why would he take you once?

NATURAL MOTHER: I think he lost interest. I didn't think he cared anymore.

[APPELLANT'S COUNSEL]: Didn't he tell you he would do whatever you wanted him to do?

NATURAL MOTHER: Yeah. *He always said things but he never did anything.*

(Emphasis supplied).

But the language of F.L. § 5–312(b) speaks to the *child*. As the trial judge observed, appellant's conduct during the period of expectancy is a relevant factor for the court's consideration. *See In re Adoption No. A91–71A, supra,* 334 Md. at 563, 640 A.2d 1085. By failing to support the woman who was carrying his child, appellant revealed his own inadequacies as a would-be father. Logically, evidence as to appellant's conduct could not be restricted solely to events occurring after the birth of the child. Indeed, in *In re Adoption No. A91–71A,* the Court explicitly said that evidence of a natural father's abandonment of the child *before the child's birth* is a relevant factor in determining the existence of exceptional circumstances. *Id.,* 334 Md. at 563, 640 A.2d 1085. Chief Judge Murphy wrote for the Court:

> A man who deserts the expectant mother, aware that there is a substantial possibility that he is the father of her child, leaving her dependent upon others, with no regard for her prenatal care or concern as to whether the mother will have an abortion or carry the child to term, thereby shows a distinct lack of regard for the future well-being of both the mother and child.

*Id.,* 334 Md. at 563–64, 640 A.2d 1085. Thus, the court below did not err in considering evidence of appellant's conduct during the natural mother's pregnancy.

In any event, the trial judge did not focus only on appellant's failure to provide support during the pregnancy. Instead, that was but one of the many factors on which the court relied. Appellant conceded that, even *after* the baby was born, he did not buy formula, clothes, or diapers, although he thought the baby was still in New York with the natural mother.[8]

---

8. The following colloquies are relevant:

> [APPELLEES' COUNSEL]: Did you buy formula for the baby?
> APPELLANT: No.
> [APPELLEES' COUNSEL]: Did you buy diapers for the baby?
> APPELLANT: No.
> [APPELLEES' COUNSEL]: Did you buy clothing for the baby?

Judge Whitfill also considered as bizarre the circumstances of the one occasion in which appellant took the natural mother to his own mother's house, left her there with people whom she did not know, and then never came back.[9] Early the next morning, the natural mother, who was then about six months pregnant, had to walk some two miles to a hospital to call home for a ride. Judge Whitfill wrote: "He took her to his home on one occasion but left her in a crowded house with persons who were strangers to her without advising her he was leaving and without leaving any messages as to where he was going. This only added to her belief that [appellant] could not be trusted to provide a stable environment for her and the child."

Additionally, the trial judge had substantial concerns about appellant's maturity. He said: "[Appellant] tries to present

---

APPELLANT: No.

\* \* \* \* \* \*

[APPELLEES' COUNSEL]: Did you ever discuss with [appellant] or did he ever discuss getting married with you?
NATURAL MOTHER: No, he didn't.
[APPELLEES' COUNSEL]: Did you ever ask him to pay any bills for you?
NATURAL MOTHER: No.

\* \* \* \* \* \*

[APPELLEES' COUNSEL]: Did he ever offer to pay child support?
NATURAL MOTHER: No.

\* \* \* \* \* \*

[APPELLEES' COUNSEL]: Have you ever received any financial support or financial support for [Baby Girl S.] from [appellant]?
APPELLEE MOTHER: No, we haven't.
[APPELLEES' COUNSEL]: To the best of your knowledge, has he made any efforts to provide financial support?
APPELLEE MOTHER: No, he hasn't.

9. The natural mother testified:
NATURAL MOTHER: He just left me there. He went somewhere. He didn't tell me where he went.

\* \* \* \* \* \*

[APPELLEES' COUNSEL]: Did he come home that evening?
NATURAL MOTHER: No.

\* \* \* \* \* \*

[APPELLEES' COUNSEL]: When did you leave?
NATURAL MOTHER: In the morning.

an image that he was enthusiastic about being a father, that he was anxious to support and pay medical expenses for his child and [natural mother] that he very much loves his daughter." Again, the judge concluded that appellant did not provide "anything but talk" to the natural mother during her pregnancy. The court stated:

> We see [appellant] as immature in his outlook on life and grandiose in his thinking. While having offered no money for medical expenses for [natural mother] and the child, and while claiming indigence when he initially appeared in this court, he claimed to be well-established in his job, well liked by all involved, destined to advance to a management position and to earn $35,000.00 per year by the end of 1994. He claimed that his mother was going to sell her house on Stout Court to him. Later, when confronted with the magnitude of the outstanding mortgage, he claimed that she would give him the house. He claimed to have a 401(k) Plan for the benefit of the child. On cross-examination he acknowledged that he had not started a 401(k) Plan but only had an intent to do that in the future.[10]

Judge Whitfill also wrote:

> [Appellant] ... in our judgment is emotionally immature and has no real concept as to the responsibilities of parenting a child.... He believes it will be fun to be a parent. He has grandiose ideas as to how he will advance and how

---

**10.** The following colloquies are relevant:

[APPELLEES' COUNSEL]: Are you going to buy [appellant's mother's house] from her?
APPELLANT: Yes.
[APPELLEES' COUNSEL]: What do you think the house is worth?
APPELLANT: House could be somewhere—$130,000.
[APPELLEES' COUNSEL]: How much money do you earn?

\* \* \* \* \* \*

APPELLANT: I make $10.95 an hour.

\* \* \* \* \* \*

APPELLANT: I am a cashier at the moment.

\* \* \* \* \* \*

I make—this time I grossed—$21,000, but every 500 hours I get a raise, and then I top out at $32,000 a year.

he will be able to provide a home for this child. In fact, he has done little to think through the process of being physically as well as financially responsible for the child.

The court was also troubled by appellant's failure to provide the natural mother with his last name. The panel majority seems to suggest that the natural mother could have easily investigated and determined appellant's last name. The point, however, is that appellant's decision to play games with his last name with the young woman who was carrying the couple's child supports the trial court's conclusion concerning appellant's immaturity and lack of genuine interest. Indeed, Judge Whitfill found it "strange" that "a man would claim his love and affection for a child but would believe that the mother of that child, while carrying the child, had no need to know his last name." The court concluded that appellant did not disclose his last name to avoid having to reimburse the New York Department of Social Services for expenses incurred by the mother in connection with the child.

As with the court's other factual findings, we must defer to Judge Whitfill's conclusion about appellant's "immaturity." The conclusion was based, at least in part, on Judge Whitfill's assessment of appellant's demeanor, which is precisely a matter within the province of the trial court. Indeed, in *Petrini v. Petrini, supra,* 336 Md. at 470, 648 A.2d 1016, the Court said: "Particularly important in custody cases is the trial court's opportunity to observe the demeanor and the credibility of the parties and witnesses."

Further support for the court's conclusion that it is in the child's best interest to approve the adoption comes from evidence about appellees and the child's relationship with them. Evidence of "the length of time that a child has been with the prospective adoptive parents and the strength of the attachment between the child and the prospective adoptive parents" is a relevant consideration in contested adoption cases. *In re Adoption No. A91–71A, supra,* 334 Md. at 562, 640 A.2d 1085. Judge Whitfill properly considered the evidence before him and said: "The child has developed ...

significant feelings toward and ties with [appellees]. *They are the only parents she has known.* She identifies with them as her mommy and daddy. Again, not only is the evidence clear and convincing, it is uncontradicted and undisputed." (Emphasis supplied).

In reaching its conclusion, the trial court considered the testimony of Ms. Jean Kushner, an L.C.S.W., who was the court-appointed expert. She said that appellees were "fit and proper parents." Similarly, the court considered the view of the child's court-appointed attorney, who recommended that the best interests of the child would be promoted by allowing appellees to adopt her. Thus, Judge Whitfill said: "[Appellees] are competent, caring parents with adequate resources and an adequate home to properly care for the child in question. The testimony of the friends and family, together with the report of Mrs. Kushner, show that the child has bonded to [appellees] in a loving and healthy way and that the child sees [appellees] as her parents."

Judge Whitfill was, however, understandably troubled by appellant's complete failure to cooperate with Ms. Kushner, who was thus never able to evaluate appellant. The court said: "Mrs. Kushner testified that she sent two letters to [appellant] inviting him to contact her so that she could include him in the investigation and that she received no response."

The trial judge was also obviously troubled by appellant's total lack of appreciation for the trauma the child will inevitably experience if she is uprooted from the only family she has ever known. In this regard, the court noted:

Mrs. Kushner ... *said on the other hand that there is no question that removal of the child from the home of [appellees] would be a severe trauma to the child.*

\* \* \* \* \* \*

She also made it clear that she does not advocate removing children from loving homes when they have bonded since bonding is the bedrock of healthy human development. She testified that the prisons are filled with people who have

never bonded to a parent figure. What happens in early life is crucial to healthy development without regard to memory.

(Emphasis supplied).

Ms. Kushner also testified that the child would grieve for appellees if she were removed from them. Yet, as the court observed, appellant did not understand the significance of the grieving process, and thought that the child would quickly forget her loss.[11] In view of the testimony, the court expressed concern that appellant's insensitivity would not help the child with her transition. He stated: "This lack of concern makes it highly unlikely that he would help the child make a meaningful transition from the adoptive parents to himself if custody were awarded to him."

Regarding the other factors set forth in F.L. § 5–312(b), there is no dispute that the criterion stated in F.L. § 5–312(b)(3)—that the child "has developed significant feelings toward and emotional ties with" appellees—has been satisfied. Judge Whitfill correctly wrote: "In fact, the adequacy of [appellees'] parenting and the fact that the child has bonded to them is not seriously contested by [appellant]."

With respect to the disjunctive factors in F.L. § 5–312(b)(4), the trial judge determined that appellant did not maintain meaningful contact with the child, despite his opportunity to do so. F.L. § 5–312(b)(4)(i). The court said:

[Appellant] made no effort to have any contact with the mother and child between the time he was confronted at the

---

11. The following testimony of appellant is relevant:

[APPELLANT]: [T]he baby has been with them for two years but she is at the age now where she will easily forget. She will cry for a couple days.... [H]ow many of us remember what we did at a year and, like, seven months. How many of us really remember? She will forget about [the appellees].... She will never know it will just—it wouldn't even be a vague memory.

THE COURT: You don't think there will be any damage to her?

[APPELLANT]: Not at all.... I don't think it would be any emotional strain on her, psychological or anything. I don't think she would have any problem. She will adapt to my family right away. She won't even remember this.

hospital on May 5, 1992 and sometime in August of 1992 when he first learned that the child was not with [natural mother]. He filed a petition for paternity or filiation but never filed a petition for custody or visitation until March of 1994. He evaded service of process until he could obtain his order of filiation. *He was more interested in pursuing the legal gamesmanship than he was in making actual contact with the child.*

(Emphasis added).

The court also concluded that appellant did not contribute to the physical care and support of the child. F.L. § 5–312(b)(4)(ii). These findings, too, are supported by the record. The natural mother testified, for example, that appellant did not provide any support and, as earlier noted, appellant admitted that he assisted the natural mother in obtaining welfare but did not provide any material help for her, even after the baby was born. Thus, the court did not err in concluding:

> In the instant case, [appellant] made no attempts to provide any support to the birth mother for her care or the prenatal care of the child prior to the child's birth. At best, accepting his own testimony, he took her to the Welfare Office and transported her to one or two doctors visits where she could use her Medicaid. He made no plans for the care of the child after its birth and did not participate with the mother in developing any arrangements for the care of the child other than to suggest that the mother could live with his mother. There was no serious effort to develop a plan for the care of the child after its birth.

> \*    \*    \*    \*    \*    \*

> *From the time of the child's birth in May, 1992, until August, 1992, he believed the child was with the mother and yet he paid no support, paid no medical bills, made no demands to see the child, and no demands for custody.*

> \*    \*    \*    \*    \*    \*

*There was no financial support offered before or after birth of the child.*

(Emphasis supplied).

## III.

The majority paints a picture of a natural father who faithfully and steadfastly attempted to exercise and protect his rights, who truly desires to be a father to his child, and who has been thwarted by the conduct of the natural mother and appellees. In its fact finding mission, the majority accuses appellees of "flagrant violations of the law" and contends that, "as a direct result of appellees' violation of the ICPC," the child's best interests "might dictate adoption...." It also states that "there is not a scintilla of evidence that appellant is not fit to be a father" and "[t]here is not a scintilla of evidence ... indicating that appellant did not want to assume the role of father." To support its decision that the approval of the adoption was improper, the panel majority also relies, *inter alia*, on F.L. § 5–312(d)(2), which provides: "A court may not grant a decree of adoption under this section *solely* because a parent has been deprived of custody by the act of the other natural parent." (Emphasis supplied).

The hue of the trial court's picture is entirely different, however. While it is true that appellant never consented to the adoption, the trial judge described appellant's interest and conduct as mere "posturing." Apart from two visits to the doctor, one prenatal visit with the natural mother to his own mother's home, one visit to the hospital at the time of the birth, and a paternity petition, the trial court saw no effort by appellant to establish genuine contact. The court found:

> [Appellant] made no demands for custody of the child prior to his attorney writing a letter to opposing counsel on April 13, 1993 [when the baby was eleven months old]. He did go to the hospital with his mother and other members of his family. He took flowers, balloons and a card. These items

were in no way of benefit to the child but were his efforts to impress the mother.

> \*   \*   \*   \*   \*   \*

When we examine the genuineness of [appellant's] desires to care for, and to parent this child, we find they are suspect. There was no caring conduct exhibited prior to the birth of the child.

> \*   \*   \*   \*   \*   \*

There were no efforts to visit with the child after she left the hospital. . . .

Appellant testified that he made numerous attempts to see the child. In contrast, the natural mother said that, after the baby was born, appellant came by the house only "a couple of times." Judge Whitfill concluded that "[appellant's] claims of efforts to contact [natural mother] are *greatly exaggerated*." (Emphasis supplied). Moreover, in his rebuke of appellant, the court concluded that appellant "stood back and did nothing to fulfill his responsibility as a father until after the natural mother made choices and he then complains. The natural mother was not required to leave the baby in a basket on his doorstep."

Based on appellant's behavior, the court also determined that, at least to some extent, the natural mother's decision not to see appellant and to place the child for adoption was directly attributable to appellant's conduct, through which he demonstrated his indifference and his irresponsibility. The birth mother was only a high school student when the child was born. In the court's view, "[appellant] intended to let [the natural mother] struggle with the child, and draw public assistance while he and his mother thought about the issue. The child cannot wait. The child requires immediate and proper loving care."

In addition, the trial court found that the birth mother did not deprive appellant of custody; rather, appellant did not *seek* custody. The court said, "[The] natural mother was not acting to deprive appellant of contact when she made a

decision to place the child for adoption. She was acting in a responsible way . . . to provide for this child."

The majority quotes the portion of appellant's trial testimony in which he expresses his heartbreak because he did not witness his daughter's first step. Certainly, when this testimony is considered in isolation, it is very moving. But the panel majority fails to recognize that the trial judge heard the testimony and nevertheless concluded that appellant's inability to see Baby Girl S. was a product of his own doing.

## CONCLUSION

Without doubt, I do *not* condone actions by persons who wrongfully snatch or conceal a baby from a natural parent who does not wish to relinquish the child. Similarly, I do not approve of those who keep a baby for a sufficient period of time in order to create the bonds that no one can truly want to sever, and who then claim that they should be able to keep the baby because sending the child back to the natural parent would traumatize the child. But in a case where the ICPC has been violated, it is the circuit court that is vested with the discretion to balance the nature and gravity of the violation with the best interests of the child.

Nor do I intend any criticism of appellant. But again, it was the trial judge's task to assess the credibility of the witnesses and to resolve the conflicting evidence. In carrying out this task, the court came to a conclusion unfavorable to appellant.

The majority has, in effect, usurped the trial court's role. Given the majority's acknowledgement of the discretion vested in the trial court and Judge Whitfill's reasoned decision in such an extraordinarily difficult case, I cannot say that the trial court erred. Although there is some evidence supporting appellant, there is other evidence supporting appellees. Judge Whitfill heard the conflicting testimony and found in favor of appellees. In setting his decision aside, the majority has retried the case on the appellate record.

What Justice Charles Levin of the Michigan Supreme Court said in his dissent in the infamous "Baby Jessica" case is apt here: "[T]his is not a lawsuit concerning the ownership, the legal title, to a bale of hay." *In re Clausen*, 442 Mich. 648, 691, 502 N.W.2d 649, 668 (1993), *stay denied, DeBoer v. DeBoer*, 509 U.S. 1301, 114 S.Ct. 1, 125 L.Ed.2d 755 (1993). *See also Krebs v. Krebs*, 255 Md. 264, 266, 257 A.2d 428 (1969) ("We are not here dealing with chattels."). Justice Levin added that the "majority, by ignoring the best interests of the child, has approached this case as if it were a contest between two parties over a piece of property." *In re Clausen*, 502 N.W.2d at 687. The same may be said here.

I respectfully dissent.